;Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska 99501
(907) 646-3400

Attorney for Petitioner

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JACK L. EARL, JR.,<br><br>Petitioner,<br><br>vs.<br><br>CRAIG TURNBULL,<br><br>Respondent. | Case No. 3:02-CV-0224-HRH<br><br>**BRIEF ON THE MERITS REGARDING PETITION FOR WRIT OF HABEAS CORPUS 28 U.S.C. § 2254** |

## I. <u>INTRODUCTION</u>

COMES NOW THE PETITIONER, JACK L. EARL, JR., by and through counsel Mary C. Geddes, Assistant Federal Defender, and submits his Brief on the Merits regarding his Petition for Habeas Corpus filed pursuant to 28 U.S.C. § 2254.

This petition was filed after the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the Act, a federal district court can approve a writ of habeas corpus on behalf of a state prisoner if his conviction was based upon an adjudication that (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

For purposes of 28 U.S.C. § 2254(d)(1), clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495 (2000). With respect to the "unreasonable application" language, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.".529 U.S. at 413.[1]

Alternatively, a federal district court can approve a writ of habeas corpus on behalf of a state prisoner if his conviction was based upon an adjudication that "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir.2000) (quoting 28 U.S.C. § 2254(d)(2) and *Williams*, *supra,* 529 U.S. at 412- 13).

Under 28 U.S.C. section 2254(d)(2), prisoners may challenge state court findings entirely on the state record. "Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence...that the process employed by the state court is defective, or that no finding was made by the state court at all." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.), *cert. denied*, 125 S.Ct. 809 (2004).

---

[1]First, a decision is contrary to clearly established precedent if the state court applied a rule that contradicts the governing law set forth in this Court's cases or confronts facts that are materially indistinguishable from a Court decision and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495 (2000).

Second, under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle but unreasonably applies it to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S., at 413. The state court decision must be objectively unreasonable, not just incorrect or erroneous. *Id*., at 409, 410, 412.

## II.    STATE PROCEEDINGS OUTLINED

Mr. Earl was charged with and tried for murder in the first degree in the Alaska State Court., Mr. Earl was convicted on October 31, 1995.  (Case No. 3AN-S94-30 CR)

He filed motions to suppress on various grounds, which were denied. (Ex. A.1)

His conviction was overturned on the basis of trial error by the Alaska Court of Appeals in a memorandum (unpublished) opinion, No. 3672, filed October 22, 1997.  (Ex. F.1)

The state petitioned the Alaska Supreme Court for a hearing. Mr. Earl also petitioned, challenging the Court of Appeals' decision to affirm the denial of his trial court motions to suppress statements and blood and urine specimens. Both petitions were denied.

Because Mr. Earl's conviction was vacated, his case returned to the state trial court. Mr. Earl moved again to suppress. (Ex. A.2)  His motions were denied on the grounds that the Court of Appeals had already decided the issues. (Ex. D) Following retrial, Mr. Earl was convicted on May 21, 1999.

The appeal of this conviction reiterated the outstanding suppression issues and new grounds for reversal.  In another memorandum opinion, No. 4555, filed April 10, 2002, the Court of Appeals agreed with the State of Alaska that its earlier decisions to deny suppression were res judicata.  The court also denied relief on the new and various grounds raised by Mr. Earl.  (Ex. F.2)

Mr. Earl's second petition for hearing to the Alaska Supreme Court was denied on July 2, 2002.

This petition followed.

## III.  ISSUES PRESENTED

Was the state court's denial of the defense objection and subsequent motion for a mistrial an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the state court? 28 U.S.C. § 2254(d)(1) and (2).

Was the state court determination that Mr. Earl was not in custody for *Miranda* purposes an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the state court? 28 U.S.C. § 2254(d)(1) and (2).

Was the state court determination that Mr. Earl's admissions were voluntarily made an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the state court?  28 U.S.C. § 2254(d)(1) and (2).

Was the state court determination that Mr. Earl voluntarily consented to providing blood and urine specimens (and the results of their testing) an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the state court?  28 U.S.C. § 2254(d)(1) and (2).

4

## VI.    STATE COURT'S FAILURE TO CONDUCT INQUIRY IN FACE OF INHERENTLY PREJUDICIAL COURTROOM ARRANGEMENTS

**A.    Summary**

Over Mr. Earl's objection, the trial judge allowed Judicial Services officers (JS) to switch security positioning within the courtroom when an incarcerated witness testified, including the defendant. These switches, which numbered five, occurred only during the defense case. Only during the testimony of incarcerated witnesses was there an officer stationed next to the 'jury door,' inside the courtroom, and visible to the jury. Mr. Earl moved for a mistrial after his testimony had evoked the same movement of courtroom officers.

The state court's denial of the defense motion for a mistrial, based upon the distinctive placement of security guards during the testimony of in-custody witnesses, was an unreasonable application of clearly established law as determined by the United States Supreme Court.

The trial court made an unreasonable determination of the facts in light of the evidence when it delegated all decision-making on the appropriateness of courtroom security arrangements to nonjudicial officers during the course of the defense case, and such arrangements risked the violation of Mr. Earl's right to a fair trial.

The appellate court made an unreasonable determination of the facts when its review presumed facts which were never established, that the visible and selective positioning of officers was 'necessary' during Earl's and others' testimonies because of their incarcerated status.

**B.    State Court Decisions**

1.    The Trial Court Proceeding, Defense Objection and Motion, and Court's Ruling

5

In Mr. Earl's second jury trial, there were thirteen state witnesses, six defense witnesses, and nine state rebuttal witnesses presented. There were three in-custody witnesses, including the defendant. All were defense witnesses.

David Lewis (Tr. 1755-1771[2]) was the first defense witness. He was in custody.

Before Lewis testified, Earl's counsel objected to what obviously was an unexpected change in the courtroom position of law enforcement officers for Lewis' testimony (Tr. 1754) Counsel noted there had been a change and that a Judicial Services ("JS") officer[3] was now stationed next to the jury door. Defense counsel asked the court for an alternative, i.e. to direct the officer to sit outside, rather than inside, the jury door. Defense counsel explained "I think there's a danger that the jury will know Mr. Lewis is in custody if you have a clearly identified police officer sitting right up there." (Tr. 1754)

The court overruled his objection, deferring to the judgment of the Judicial Services officers .(Id.)

The next and second defense witness, Ron Pollack, was a local realtor. (Tr. 1775) For Mr. Pollack's testimony, no officer was positioned by the jury door.[4]

The third defense witness, Cyril Reape, was in custody. (Tr. 1785) For Mr. Reape's testimony, the courtroom security added an officer next to the jury door.

_____

[2] The transcript citations in this section exclusively reference Ex. E. .

[3] The Judicial Services Unit is a  Section of the Alaska State Troopers. See, e.g. Turney v. State, 922 P.2d 283, 284 (Alaska App. 1996). As such, JS officers are uniformed and armed.

[4] This inference is clearly supported by defense counsel's statement at the time he moved for mistrial. (Tr. 2151-2152)

The fourth defense witness, Donald Hudson, was an emergency room doctor. (Tr. 1808)  For Dr. Hudson's testimony, no officer was positioned by the jury door.[5]

The fifth defense witness, John Smith, was a psychiatrist.  (Tr. 1845) No changes in officer positioning were made. [6]

The sixth defense witness was Jack Earl, the defendant, who was in custody. Mr. Earl had been present for the entirety of his trial. Nevertheless, for his testimony, an officer was again positioned next to the jury door. (Tr. 1919-2151)

Following Mr. Earl's testimony, his defense counsel asked for a mistrial on two grounds.

> Okay. While we're taking this break, and I want to make this clear for the record, I want to move for a mistrial, based on a couple of things. Number 1, I had mentioned previously the positioning of the clearly uniformed officer by the exit where the jury comes in – exit/entrance where the jury comes in. The court said he rules on that, and want [sic] to renew that as a motion for mistrial. I think that clearly clues up to the jury that those people are in custody, particularly when we have other witnesses during the presentation of those other witnesses, we have two clearly marked uniformed officers by the two exits, one on the right of defense counsel table, one on the left of the prosecutor's table, and nobody over by the entrance where the jury comes in. Then, all of a sudden, here we have a witness who, there's now a clearly uniformed officer sitting by the entrance where the jury comes in. That clues the jury off that that (sic) person's in custody, and typically we go through great lengths to avoid doing that. That was done with Cyril Reape, with David Lewis, and obviously with Mr. Earl himself, the defendant in this case.

(Tr. 2151-52)

---

[5]Ibid.

[6]Ibid.

7

The second cited grounds for mistrial was the testimony elicited from Cyril Reape during cross-examination. This examination elicited the information that, at some time, both Reape and Earl were in the same "facility."[7]

The trial court denied the motion, explaining that "I don't, as a practice, tell JS ["Judicial Services"] officers how to do their job, and so –it's not been my practice to tell them where to stand and how to stand." (Tr. 2152) The defendant declined a cautionary instruction, after the trial court judge offered the opinion that a cautionary instruction might only re-emphasize the claimed error. (Tr. 2152-54)

2.    The Court of Appeals' Unpublished Memorandum Decision

In an unpublished decision, The Court of Appeals "concluded that Judge Sanders did not err in overruling Earl's objection to the placement of the court's security officer and refusing to grant Earl's motion for a mistrial. *Earl v. State*, 2002 WL 531097 (Alaska App. 2002).

3.    The State Supreme Court

On July 10, 2003, the Alaska Supreme Court summary denied Mr. Earl's petition for hearing from the Court of Appeals unpublished decision..

**C..    The Clearly Established Federal Law Applicable to This Claim**

"[C]learly established Federal law" in § 2254(d)(1) refers to the holdings of the Supreme Court 's decisions as of the time of the relevant state-court decision," *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495 (2000).

_____

[7]This court has previously ruled that Mr. Earl cannot seek habeas relief on the grounds of this error, because of a failure to exhaust.

The Court has addressed the effect of courtroom practices on defendants' fair-trial rights in *Estelle v Williams*, 425 U.S. 201, 96 S.Ct. 1691 (1976) in which the State compelled the defendant to stand trial in prison clothes, *and Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S.Ct. 1340 (1986) in which the State seated uniformed state troopers in the row of spectators' seats immediately behind the defendant at trial.

The Court has concluded that some practices during trial are so inherently prejudicial that they must be justified by an "essential state" policy or interest that the Constitution forbids it unless that use is " justified by an essential state interest"-such as the interest in courtroom security-specific to the defendant involved. *Holbrook*, *supra*, 475 U.S. at 568-569; *see also Illinois v. Allen*, 397 U.S. 337, 343-344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

**D.     Analysis**

The petitioner's right to a fair trial was violated by state conduct in the form of the selective positioning of uniformed officers during his and other incarcerated defense witnesses' testimonies. The selective and conspicuous deployment of a uniformed officer close to the jury only during portions of the defense case, and the testimony of Mr. Earl and two of his witnesses was inherently prejudicial. In the absence of a prior determination that state actions were justified by an essential state interest,  the motion for mistrial should have been granted.

Mr. Earl does not contend that the presence of uniformed, armed  officers, by itself, was unduly prejudicial. In fact, if three court officers had merely established and maintained the same positions throughout the trial, Mr. Earl would have had no complaint.

The courtroom security arrangements by the Judicial Services officers necessitated five changes of officers' positions within the defense case. These back-and-forth changes of position

were likely to draw the jury's attention and certainly emphasized the increased security arrangements for only some of the witnesses. And because the officer was stationed inside, and not outside, the jury door of the courtroom, jurors could infer that the guard was positioned there to specifically protect them, and not merely to guard the exit.

The court-sanctioned conduct here created an unacceptable risk of impermissible factors coming into play and unfairly prejudicing the defendant.

The Constitution, as a matter of due process under the Fifth and Fourteenth Amendments, protects the right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503-504 (1976). A basic component of a fair trial is the presumption of innocence in favor of the accused, and the courts must administer criminal justice in a way so as not to dilute that principle. Id. For example, where a defendant is clothed in prison garb, and that particular display reminds the jury of his incarcerated status, the Supreme Court has held that there is "an unacceptable risk of impermissible factors coming into play." *Estelle v. Williams*, 425 U.S. at 505. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand" only, and not from other sources. *Turner v. Louisiana*, 379 U.S. 466, 463, 85 S.Ct. 546 (1965).

For that reason, a defendant may not be compelled to wear prison garb and shackling is forbidden Such circumstances inject evidence not subject to cross-examination and undermine the presumption of innocence.

In this instance, the selective movement of court officers corresponding with the testimony of in-custody witnesses clearly communicated their incarcerated status, just like prison garb would do. However, more problematically, the movement of security officers close to the jury

also conveyed evidence to the jury that the defendant and the others were particularly dangerous and that the jury required additional protection from them.

    Furthermore, Mr. Earl had already been sitting in the courtroom throughout the trial. Since he had not been disruptive during the trial, the movement of courtroom security to the jury's vicinity for his testimony made a glaring statement, i.e. Mr. Earl was not to be trusted near the jury. If Mr. Earl was not to be trusted near the jury, how would he ever be trusted by the jury?

    The state conduct in this trial was inherently prejudicial. This was not an instance where a jury observed a uniform arrangement, with the troopers maintaining the same position for each witness. *Compare Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S.Ct. 1340 (1986). Rather, the selective arrangement "branded" the defendant in particular and his witnesses "with an unmistakable mark of guilt," and arbitrarily discriminated against one who had not been able to post bail. *See Estelle v. Williams, supra*, 425 U.S. at 505-506 and 518.

    Before a trial court allows such inherently prejudicial arrangements,, the court must first determine that the action is justified by an essential state interest. The reason for "close judicial scrutiny" with such inherently prejudicial conduct is clear. Id., at 503 -504. Reminders that a witness and/or accused is confined "may affect a juror's judgment," id., and these were flagrant. It is not known whether the questioned arrangement could have been justified. This was not a case in which a the decorum of the court had been threatened by a witness - there were no outbursts - nor was there a "contumacious" defendant who had to be controlled. *Compare Illinois v. Allen*, supra, 397 U.S. at 334.

    In its unpublished memorandum opinion, the Alaska Court of Appeals certainly acknowledged that the law prohibits treating defendants and witnesses in a manner that would

identify them as someone in custody to the jury. However, it failed to reasonably apply those principles and Supreme Court law to this case by recognizing that the selective positioning of officers close to the jury during the defendant's (and others' testimonies) was conduct likely to draw the jurors' attention, inject impermissible and prejudicial information, and *unnecessarily* risked Mr Earl's right to a fair trial. 28 U.S.C. § 2254(d)(1)

The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of the facts in light of the evidence" under § 2254(d)(2). *See Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000)(cite omitted) Here, the appellate court's review of the relevant facts presumed factual findings which were never made, i.e. "Earl and his two witnesses were in custody and it was necessary to have some security while they testified." *Earl v. State*, 2002 WL 531097 at 6 (Alaska App. 2002). As the trial court made no inquiry whatsoever into the questioned security arrangement or into the proposed alternative that would not create evidence, i.e. the stationing of the officer outside the jury door, it cannot be said that there was any determination that the conduct was "necessary."

Because Mr. Earl was denied his right to a fair trial, his petition should be granted.

12

## V.    STATE COURT'S FAILURE TO SUPPRESS STATEMENTS THAT WERE NEITHER PROCEEDED BY MIRANDA ADVISEMENTS NOR VOLUNTARY

### A.    Summary

In state court, Mr. Earl sought the suppression of his statements, and the fruits of his statements, on the ground that  the police interrogations were  not preceded by the advisements required by the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Mr. Earl argued, alternatively, that his statements were inadmissible because they were involuntarily made, i.e. obtained by law enforcement by overbearing or coercive means. *See, e.g.,  Chavez v. Martinez*, 538 U.S. 760, 770 (2003)(use of involuntary statements at defendant's trial barred by 5th Amendment).

In the course of his seven-hour contact with Anchorage police officers during the night and early morning hours of New Year's Eve, Mr. Earl made incriminating statements in response to their questions.[8]  During this continuous contact and isolation in police facilities, Mr.

---

[8]Earl's damaging admissions to the police were summarized by the Court of Appeals.

The interview at the main police station began at about 1:00 a.m. on January 1, 1994, and was videotaped. During the interview Earl stated that he "didn't kill [Ricker] on purpose" but that Ricker had locked him out of the apartment, and when Earl kicked the door in, Ricker had a knife. Earl stated that he and Ricker then struggled, Earl hit Ricker repeatedly, Ricker swung the knife at him, and Earl then somehow got the knife and "jammed it into his body [.]" Earl had no explanation for the scissors and also denied putting a cloth on Richer's head or wrapping a cord around his neck. Earl stated that Ricker had a history of pulling knives on him and throwing things at him, that they had fought before, and that Ricker had hit him in the forehead, apparently on the night in question. Earl stated that he had been involved in martial arts for fourteen years and had boxed semi-professionally for two and one-half years. Later in the interview, Earl again admitted killing Ricker, changing at least some of his own clothes, walking to a nearby park and hiding his clothes in a tree.

1997 WL 661175 at 1 (1997).

Earl was subjected to hours of relentless recorded interrogation in confined areas. He was prohibited from returning home. He complained he needed his leg brace outside his home. He was deprived of his coat or any outerwear with which he might brave the Alaska winter weather. He was deprived of sleep even though he said he needed it. He was confronted with evidence of his guilt, photographed, fingerprinted, had his clothes taken, and subjected to searches of his blood and urine. Even though he was told he was not under arrest, the police conditioned his movement on their "need" to first finish their investigation. The police officers in this case attempted to circumvent *Miranda* by deliberating postponing the official 'arrest' until the needed incriminating evidence had been obtained. Any reasonable person would have felt that he was not free to leave and break off police questioning given the totality of the circumstances.

Even if *Miranda* warnings were not required, suppression of his statements and the fruits of those statements are still required because the police used coercive methods to overcome Mr. Earl's will to resist. They created a ruse under which he agreed to travel to the police main station. They ignored his objections to travel to the station for interviews by homicide investigators. The police ignored his refusals to give blood and urine specimens. They suggested assistance with housing conditioned on Earl's compliance with the homicide investigators. From these circumstances, combined with those pertinent to *Miranda* violations, the court could have only concluded that Mr. Earl's statements were not voluntary.

## B.    State Court Decisions

The state court found that Mr. Earl was not in "custody" for Miranda purposes, and therefore were not subject to the exclusionary rule. The court also found that his statements had not been involuntary.

14

1.      The Trial Court Ruling

    Following an evidentiary hearing, the state trial court stated its ruling on record.

There are, of course, always many curious things that I suppose courts and lawyers wonder about, judges wonder about. Why don't we give – why don't officers give the *Miranda* warnings even when they're not required to do so. I don't know why. Perhaps we'd avoid some of these hearings. But on the other hand, that's not the question. The question is whether they were required. And it does – I think it – it's well for all of us to remember that the rules of the playing field do not apply and shouldn't apply in cases where someone is stabbed to death. There are more important considerations than those which – obtained upon playing fields. When – at least I'm always curious, when there is an interview in which such disastrous admissions are made by a defendant, disastrous from his point of view, and to understand why those are made, often the argument gets circular and one says, well, if he made such disastrous admissions, it must be because he was coerced by the custodial setting in which he found himself. I don't think that's in fact a rational analysis. I suppose if I had to speculate on his purposes, and particularly Mr. Earl's purposes in this case, I would find that there were probably a twofold purpose in giving the interview he gave. First, to minimize his conduct to the officers through deceit and rationalization; and secondly, to minimize his conduct to himself through self-deception and rationalization. And I suppose that grows out of what we all feel, the necessity of being thought well of by our fellow human beings and to think well of ourselves. Are there factors here which we could look to from *Hunter* and – there are certainly factors from *Hunter* that we need to consider. But there are certainly factors that we could look at that would lead us to conclude, as the defendant had, that they're consistent with the defendant's argument: The length of the interview, the place of the interview, the lack of a coat, the fact at page 143 of the transcript he was told to sit down. There are a lot of things we can look at and say, well, those factors are consistent with the defendant's argument. But if we look at the totality of the circumstances, I think we have to conclude that the defendant was not placed in custody formally. He was constantly assured that he was not under arrest, that there was no de facto custody here, that there wasn't a functional equivalent of custody, that there wasn't a psychological equivalent of custody. I don't believe that a reasonable person would have felt they were in custody or not free to leave. I don't believe that the defendant himself thought he was in custody on this occasion. The defendant's motives for staying there were, I believe as I have indicated. I believe it was a non-custodial interview. The statements were voluntary, not coerced. His will was not overborne, and his consents to the search and seizures were likewise voluntary. The motion should be and hereby is denied in its entirety. I guess I don't even see this as a close case.

15

(Ex. C, Tr. 225-227[9]).

    2.    <u>The Court of Appeals' Unpublished Memorandum Decision</u>

    The appellate court decision, which was unpublished, can be found at *Earl v. State*, 1997 WL 661175 (Alaska App.1997) . The Court of Appeals did not address the trial court's starting point for analysis, i.e. that what is fair (on the proverbial playing fields) doesn't apply when "someone is stabbed to death." (Tr. 225) Nor did the appellate court address the trial court's prefatory opinion that claims of coerced confessions are really only attempts to rationalize why a defendant would make a self-inculpatory statement. (Tr. 226).

    We have reviewed the interrogation and we conclude that Judge Rowland's ruling is supported by the record. The police initially contacted Earl at the crime scene a little after 11:00 p.m. on December 31, 1993. They formally interviewed him at the police station from about 1:00 a.m. until 4:45 a.m. on January 1, 1994. Earl was a suspect, and was apparently the only suspect at this time. Earl was never actually physically restrained during the interview; nor were there facts which indicated circumstances which would be the equivalent of physical restraint. The tone of the interview appeared to be cordial, although the detectives at times confronted Earl by challenging his version of the incident which led to Richer's death. However, the police remained calm, and were not hostile to Earl. At numerous times during the interrogation the police assured Earl that he was not under arrest, that he was free to terminate the interview at any time, and that they would release him at the end of the interview regardless of any statements he made to them. The constant police assurances to Earl throughout the interrogation support Judge Rowland's conclusion that a reasonable person in Earl's position would have understood that he was free to break off police questioning and leave. We accordingly conclude that Judge Rowland did not err in denying this suppression motion.

*Earl v. State*, 1997 WL 661175 at 4 (Alaska App.1997)(emphasis added).

---

    [9]In this section of the brief, "Tr." citations refer to Exhibit C, the court transcript of the state court omnibus hearing, which included the evidentiary record on Mr. Earl's motion to suppress.

16

3.    On Remand in the Trial Court

Back in the trial court, Mr. Earl reiterated his motions to suppress before a newly assigned Superior Court judge, Judge Sanders. (Ex. A.2)  The trial court deferred to the court's earlier rulings, indicating that it was a settled issue, which had been preserved.  (Ex. D)

**C.    The Clearly Established Federal Law**

1.    Law Applicable to The *Miranda* Claim

The police failed to advise Mr. Jack Earl of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before interrogating him  It is undisputed that Mr. Earl  was being interrogated within the meaning of the *Miranda* rule. *See  Rhode Island v. Ignis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 LED.2d 297 (1980) (interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect). The question presented  was whether Mr. Earl was in custody for *Miranda* purposes.

The decision in *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation. Because  compulsion is "inherent in custodial surroundings,." said the Supreme Court,  "the privilege against self-incrimination is jeopardized." *Miranda*, 384 U.S..at 444.[10] As a result of the *Miranda* decision, before the police may question a suspect in custody, they must inform a suspect that (1) he has the right to remain silent, (2) his statements may be used against him at trial, (3) he has the right to the presence of an attorney during questioning, and (4) if he cannot afford an attorney, one will be appointed. 384 U.S. at 478-79. If such an advisement has

---

[10] The Supreme Court has held that *Miranda*'s warning-based approach to determining admissibility of statement made by accused during custodial interrogation was constitutionally based. *Dicker son v. United States* ,530 U.S. 428, 120 S.Ct. 2326 (2000).

not taken place prior to a custodial interrogation, the admissibility of a defendant's statements may be barred under the Exclusionary Rule.

*Miranda* has been consistently applied to prosecutions arising in state courts, as well as federal. *See, e.g., Stansbury v. California*, 511 U.S. 318 (1994) (per curiam ); *Minnick v. Mississippi*, 498 U.S. 146 (1990); *Arizona v. Roberson*, 486 U.S. 675 (1988); *Edwards v. Arizona*, 451 U.S. 477, 481-482 (1981).

The Supreme Court has stressed that it was the custodial nature of the interrogation which triggered the necessity for adherence to the specific requirements of its *Miranda* holding. *Beckwith v. United States,* .425 U.S. 341,  345 (1976)(cites omitted). Custody, for purposes of *Miranda*,  occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. *Miranda, supra* 384 U.S. at 444; *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138  (1984).

The Court applied the *Miranda* custody test for the first time in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The second case of note was *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517 (1983). The custody determination is an objective one. In *Thompson v. Keohane*, 516 U.S. 99, 112 116 S.Ct. 457 (1995), the Court offered the following description of the *Miranda* custody test: "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

While the Supreme Court is concerned with the suspect's subjective belief that "his freedom of action is curtailed to a degree associated with formal arrest," the ultimate question is

whether that belief is objectively reasonable under the circumstances. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138 (1984) *quoting Beheler*, supra, 463 U.S. at 11250.

    2.    <u>Law Applicable to the Involuntariness Argument</u>

        If a confession is introduced in evidence, the state must prove that the confession was voluntary, since involuntary confessions are inadmissible on the ground that they constitute a violation of the constitutional safeguards as contained in the Fifth and Fourteenth Amendments to the Federal Constitution.

        To determine if testimonial evidence supplied by a defendant was involuntary, a court must ask whether, in the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (voluntariness is evaluated by examining the "totality of circumstances" surrounding the "making and signing of the challenged confession"). *See also Townsend v. Sain*, 372 U.S. 293, 307 (1963) (test for involuntariness is whether suspect's will was overborne or whether confession was product of rational intellect and free will), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318, 60 USLW 4339 (1992) and *Culombe v. Connecticut*, 367 U.S. 568, 602 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037(1961) ("will overborne" if statement not "product of an essentially free and unconstrained choice by its maker").

        The factual inquiry centers upon (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. *See Mincey v. Arizona*, 437 U.S. 385, 399-401 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290(1978) (confession involuntary because continued police interrogation of hospitalized suspect overwhelmed suspect's free will). To

determine whether a defendant's statement is the product of coercion and, therefore, involuntary, courts commonly consider the following factors: the location of the questioning; whether Miranda warnings were given; whether the accused initiated contact with law enforcement officials, as well as an accused's personal characteristics, such as youth, drug problems, psychological problems, physical condition, and experience with the criminal justice system. Custodial Interrogations, *Annual Review of Criminal Procedure,* 35 Georg.L.J. 162, 181-184 (June 2006)(summarizing circuit court decisions).

**D.    The Factual Record**

    1.    The Totality of Circumstances Were Not Considered by the State Courts

    As the following recitation makes clear, the totality of the circumstances which operated in favor of suppression were not considered.[11]

- At 11:10 p.m. on December 31, police received a 911 call from Jack Earl. (Ex.2.)
- Earl reported that, upon returning home, he had discovered the dead body of his roommate, Jeff Ricker.  (Id.)
- Anchorage Police Officer Matthew Dahl was the first on the scene (Tr. 78), and made contact with Earl who was inside the front door of the apartment . (Tr. 79)
- Dahl directed Earl to remain where he was. (Tr. 79, 97)
- Dahl walked through the apartment and observed Ricker laying on his back in the living room in a pool of blood, with a pair of scissors embedded in his chest. (Tr. 78) Paramedics confirmed that Ricker was dead. (Tr. 79)
- Dahl remained with Earl as other police officers arrived. Earl was directed to wait outside the apartment building, and Dahl waited with him. (Tr. 79, 99-102)

_____

    [11]Numeric exhibit references are to documents filed as part of "Exhibit B." Under "Exhibit B," counsel has maintained the same numeric ordering for exhibits identified in the state court omnibus hearing, i.e. Ex. 1-8..
    "Ex. 6" (Ex. B.6)  is a composite of police transcripts contained in other exhibits. This transcript was included in the trial court record and so will be referred to with "(R. _)" citations.
    Ex. 8 is a transcript of the interview videotaped by the police.
    "Tr.__" references in this section refer exclusively to the transcript of the 1994 omnibus hearing, which is "Ex. C."

- Earl was dressed in a t-shirt. He was cold. (Tr. 80, 101)
- Dahl noticed that Earl had blood on his pants (Tr. 102) and seemed intoxicated. (Tr. 103-4)
- Dahl considered Earl a "possible suspect." (Id. )
- Dahl's supervisor directed him to keep Earl in his presence until the homicide detectives arrived. (Tr. 106, 144, 146)
- Earl was placed in the back seat of the patrol car while Dahl sat in the front seat. (Tr. 82)
- Dahl directed Earl to his patrol car because it was "cold out." (Tr. 80, 82, 105)
- As directed by his supervisor, Dahl taped his contacts with Earl. (Tr. 82)
- Dahl told Earl he was taping their conversation. (R.. 26) Dahl asked Earl to tell him what happened. (Id. )
- Dahl told Earl two things: he was not under arrest, but that the investigators needed to speak with him. (R.28)
- Earl told Dahl that he urgently needed to urinate. (Tr. 107-8)
- Dahl told him to "hang on a minute, " and he got out of the car to speak with his sergeant. (Tr. 108)
- Dahl told Earl that he could not let him return to his apartment but he could urinate at a police substation, to which Dahl would take him.(R.. 34)
- Earl asked if he was under arrest. (R..34)
- Dahl told Earl he was not under arrest, but the police needed to talk to him, and others. (R. 34)
- Dahl transported Earl to the police substation in the patrol car. (R..30)
- During this drive, Dahl questioned Earl about what had occurred. (R. 26-30)
- The patrol car was locked so that only Dahl could open them. (Tr. 116-7)
- Dahl and Earl arrived at the police substation about 11:31 p.m.   (R. 30)
- The substation was a small, one room police station with a bathroom. (Tr. 125-7, 170, 172)
- A second police officer arrived at 11:35 p.m., and remained there. (Tr. 130, 168-170;. R. 32)
- After using the bathroom, Dahl did not return or offer to return Earl to his apartment. (Tr. 130)
- Dahl testified that he intended to keep Earl there until homicide investigators arrived. (Tr. 130)
- Earl was directed to have a seat at the substation while other officers arrived. (Tr. 128)
- Earl asked to smoke a cigarette, and Dahl and the second officer went with him outside the building. (Tr. 133-4;  R. 32-34)
- Earl was told that Officer Dahl couldn't return inside the substation until Earl finished smoking. (R.. 37)
- Earl complained to Dahl that he shad been prohibited from getting his coat from his apartment and said that he wore a brace on his knee when he went out (R.. 37)
- A third police officer arrived, Sgt. Cobb. (Tr. 146)
- While he was permitted to smoke outside, on each of three occasions,  officers escorted him outside while he did so. None of the officers smoked. (Tr. 133-34, 140-41, 148; R. 41-43, 69 )
- When Earl next went to the bathroom for a drink of water, a police officer accompanied him. (Tr. 136; R. 45)

- The officers questioned Earl continuously concerning (Tr. 32-38)
  - his activities that night, his consumption of drugs and alcohol,
  - the clothing he had worn that night
  - the source of the blood visible on Earl's clothing
  - the bruise on Earl's forehead
  - and other matters related to Ricker's death
- After he had been at the police substation for forty minutes, at 12:09 a.m., Earl asked "When am I going to get going" and, later, "When am I gonna go?," to which Dahl twice responded, "I don't know." (Tr. 133-4, 148.; R. 38)
- While advising Earl again that he was not under arrest, the police repeatedly expressed the need for Earl to speak with the homicide investigators who would want to ask about the results of their search of Earl's residence. (R.39) Earl responded that "I'll be here, where am I going to go?" He also said, "I have nowhere to go." (Id.)
- Earl then asked about retrieving his jacket. In response to this comment, the police stated, "The investigators should be here in a few minutes, they're just gonna want to talk to you to get important information." (R. 40) .
- Advising Earl again that he was not under arrest, the police asked him to go to the main police station to talk to homicide investigators. (R. 58)
- Earl refused to go to the main police station, stating ""Eh uh I'm sorry." (Id)
- Despite Earl's refusal to go to the station, the police persisted with 'the need' for him to speak with homicide investigators. (R. 58)
- When Earl then stated that he would like to go home, Earl was informed he could not go home because his home was a crime scene. (R.59)
- Earl again stated he had no other place to go. (Id.)
- The police once again told Earl that he 'needed' to be interrogated by homicide investigators. (R.59-60)
- Again, Earl replied that he did not want to go to the police station. (R..59-60)
- Earl was also asked for his consent to search his apartment and signed it. (R. 61-63)
- Officer Dahl told Earl that homicide investigators "can probably help you get a place to stay or something after they talk to you." (R.64)
- Dahl told Earl that an investigator was coming and he would need to know what answers Earl could give. (R. 65)
- When Earl complained again that, "I don't even have a coat,.." the officers said, they knew that, and it was a "bad scene." (R.65)
- The police again told Earl that he needed to submit to interrogation by the detectives who had investigated the scene. (R.67)
- At 12:31 p.m., after Earl had been at the police substation for an hour, the police officers offered Earl another cigarette. For the third time, as mentioned, Earl was escorted outside by officers who did not smoke.(R. 69, 41-43)
- Earl renewed his request for his coat, and was promised that the police would retrieve it. (R. 42)
- At this time, a fourth officer, homicide investigator Gifford arrived. (Tr. 193)

- Earl was told that Jamie, a third and female roommate, was very upset. Earl was told that Jamie needed Earl's support. On that basis and for that reason only, Earl was asked if he would go to the main police station.  Earl agreed. (R. 69-70)
- Sgt. Michael Grimes, the fifth officer arriving at the police substation, (Tr. 194) took Earl to the main station. (Tr. 200-01)
- When they arrived, Grimes escorted Earl into a non-public and secure part of the station. (Tr. 200-203)
- Earl was immediately brought into an interview room with a one-way mirror (Id.).
- The police offered no explanation for their failure to permit Earl to speak to Jamie. (Tr. 201-03, Ex. 8, p. 10)
- The police homicide investigators immediately commenced an interrogation of Earl despite his prior refusals to be transported to the station for that purpose. Grimes, Potter, Gifford and others participated. (Ex. 8)
- The interrogation at the main station lasted 5 hours. (Ex. 8)
- Earl accepted an offer of coffee but asked again for his coat.  He was told it would be awhile until it could be retreived from his apartment. (R.74)
- Grimes told Earl that he wasn't under arrest "right now," (Tr. 206) but that "we need to find out everything that you know." (Ex. 8, p. 2, 3 )
- During the interrogation, Earl intermittently stated he was in pain, hungry, intoxicated, (Ex. 8, p. 3, 17-8 and his  need of a coat (Ex. 8, p. 2,3 )  .
- Earl told the police he suspected he was being taped.(Ex. 8, p. 1041) and didn't believe he would go home. XX )
- Grimes told Earl that he was not under arrest right now. (Tr. 206)
- After forty minutes of questioning at the main station, the interrogation became confrontational. (Videotape)
  - Grimes said he didn't believe Earl's account that blood on his pants came from a cut on Earl's hand.
  - Grimes told Earl that the police would "have to take" his pants (that he was wearing) for testing.
  - Grimes told Earl that he would have a toughttiem explaining how Ricker's blood got on his pants. (R. 98)
  - Grimes stated that he "knew" the blood on Earl's pants and boots was Ricker's. (R.98-99)
  - Grimes told Earl that Earl's boot print was on and next to Ricker's body. (Ex. 8, 25-27)
- Earl repeatedly expressed disbelief that he was free to leave. (Ex. 8, p. 2, 3, 49 )
- In the course of imploring Earl to tell him what happened, Grimes state, "We finish our investigation and we just wait and see what happens. (Ex. 8, p. 25-27)
- Earl then admitted he killed Ricker (Ex. 8, p. 27)
- The police continued the interrogation about the killing, over the next four hours. (Ex. 8, p. 36).
- At one point during the interrogation  Grimes told Earl to "sit back down ".  (Ex. 8, p. 36)
- The police reiterated their intent to seize Earl's clothing. (Ex. 8, p. 47-48 )

- They insisted Earl was not under arrest, and that they would provide him a ride to whereever he wanted to go (Ex. 8, p. 49), once they finished the investigation (Ex. 8, P. 65)
- The officers were equally clear, however, that what they needed to do "first" was to
- take him to provide blood and urine specimens. (Ex. 8, p. 55-56)
- and finish the investigation (Ex. 8, p. 65, 69)
- At a point later in the interrogation, Earl confronted Grimes with his earlier statement that Earl was not being taped. Grimes admitted he was (Ex. 8, P. 72)
- Grimes told Earl that part of their "policy" was to take fingerprints, palmprints and photographs of him, so that they can do their investigation. (Ex. 8, p.88-89)
- In light of this, Earl continued to express his disbelief that he was being released. (Id. )
- When Investigator Gifford joined Grimes and Potter, Earl was asked to repeat his account. After initially refusing, he was again interrogated (Ex. 8, p. 100)
- Earl repeatedly reiterated his disbelief he would be allowed to leave. Gifford responded, "Well, we gotta look at everything...y'know...take out time and make sure we get everything right. (Ex. 8, p. 104).
- When Earl was asked to provide consent for blood and urine specimens, Earl refused. He said "No chance." "No!", "Cannot," "Will not," and "Huh uh." (Ex. 8, p. 55-56)
- Despite these refusals, the police persisted with their "need to do this" and Earl ultimately relented. (Ex. 8, p. 56)
- Near the end of the interrogation, Gifford reassured Earl, that "when we get done, you're gonna leave." (Ex. 8, p. 129-130)
- When Earl again questioned that he would be permitted to leave, Gifford told him he would be permitted "when we're done." (Ex. 8, 129-30)
- Earl was then taken by two investigators, Grimes and Potter, to the hospital. (Ex. 8, 137, 143-144, and Tr. 181, 587)
- These specimens were taken from Earl at 5:10 p.m. (Tr. 208)
- Sometime after 6:00 a.m. Earl was released at a restaurant, with a few dollars for breakfast. (Tr. 181-183)
- He was arrested that afternoon. (Tr. 208)

2.    The Analysis

_____    First, the state court applied a rule that contradicts the governing law set forth in this Court's cases. 28 U.S.C. § 2254(d)(1), The trial court's decision on "custody" turned, at least partially, upon an impermissible consideration: the defendant's motivations and whether the defendant seemed to believe himself in custody. See Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (court must assess "how a reasonable man in the suspect's position would have understood his situation")

24

Second, the state appellate court decision is also at issue, under U.S.C. § 2254(d)(1), because the state court correctly identified the governing principle from Supreme Court decisions but unreasonably applied the principle to the facts of Mr. Earl's case.

Alternatively, because the state court decisions "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court," section 2254(d)(2) also provides relief. The trial court's determination was unreasonable because its findings of historical fact were almost non-existent ("There are a lot of things we can look at and say, well, those factors are consistent with the defendant's argument" and "the defendant was not placed in custody formally...[and]   was constantly assured that he was not under arrest") , and its conclusions wholly summary ("there was no de facto custody here, that there wasn't a functional equivalent of custody, that there wasn't a psychological equivalent of custody"). The appellate court's review, albeit more extensively stated, was defective because it omitted many facts inconsistent with a failure to suppress the statements and physical evidence the police secured from Earl.

Additionally, the state courts failed to adequately consider the totality of the circumstances developed in Mr. Earl's case with respect to the voluntariness issue.  Although the police repeatedly represented that Earl would be allowed to leave, Earl quite understandably manifested disbelief because the police consistently postponed that release – over several hours – to only when the police determined their investigation was complete, i.e. "when we're done. " (e.g. Ex. 8, p. 129-130)  The police turned a deaf ear to Earl's refusal to give specimens, and persisted with their demand for a consent, once again postponing his release until Mr. Earl had given the specimens. . In *Culombe v. Connecticut*, 367 U.S. 568, 602 367 U.S. 568, 81 S.Ct. 1860 (1961) the

25

Supreme Court stated that a defendant's will has been overbourne if the statement he gives is not

"product of an essentially free and unconstrained choice by its maker."

A reasonable application of the law to the facts and a reasonable determination of the

issues would have turned on the following factors.

First, the length of contact was exactly that type of 'marathon' session considered

inherently coercive, and therefore of concern,   in *Miranda*. Jack Earl contacted the police at 11:00

on December 31, 1994, to report his discovery of a roommate's body. Nevertheless, he was conveyed

to and maintained in what were exclusively police facilities for six  hours,  from 11:10 a.m. until

approximately 5:10 a.m., when he was taken by a police car to the hospital to give urine and blood

specimens. .The entire police contact was continuous for seven hours.

While Mr. Earl had voluntarily contacted the police, he never agreed to go to a police

facility for the purpose of an interview. He had  agreed to go to the police substation for the purpose

of using the bathroom, and agreed to go to the main police station for the purpose of seeing his

roommate. In both instances, his agreements were abused. He was not returned home but told to sit

and wait. He was not brought to the police station to comfort his friend, but to be interrogated.

Earl, while not handcuffed,  was told - and shown - that he would not be left alone

during the evening as he was always accompanied by more than one officer. Except for a brief time

alone with Officer Dahl, who was openly taping his statements, Earl was always in the company of

more than one police officer at a time. .

Jack Earl was deprived of his freedom of action in numerous ways.  Although Mr.

Earl initially contacted and summoned the police to his home, he was thereafter directed outside and

prohibited from returning for any purpose for approximately fifteen hours. He was directed into the

rear seat of a locked police car while the officer sat in front..Needing to urgently urinate, he was not allowed to exit the car inorder to urinate outside it.  While he agreed to be brought to a nearby substation for the purpose of urinating there, the officers thereafter said he could not return home and he was asked to be seated and wait.  When he was permitted to smoke outside the police station,  he was accompanied at all times by at least two officers who did not smoke, and who stated they could not leave him outside. When he went into the bathroom for some water, a police officer accompanied him into the bathroom.  Although he was told he was "not under arrest" by the police officers at the substation, they also claimed not to know when he could in fact  "get going." The freedom to "get going" was conditioned upon waiting for the police to complete their investigation, which included their future contact with him, and his compliance with their numerous demands for evidence. Despite his requests for his coat, no coat or outer clothing was  provided to him although it was a cold winter night in Alaska, the police officers were at his apartment,   the substation was quite close to that location, and the officers at one point said they would retrieve it.  While Mr. Earl agreed to be transported to the main station for a limited purpose, i.e. to see his roommate, he was never given that opportunity once he was there. His clothes were ultimately taken from him.

The police representations (that he could leave) were conditional and illusory. The police officers at the substation could not tell him when he could leave The police officers could not tell him when he could get his jacket. The police officers conditioned his leave-taking on his cooperation with the police investigation, and the investigation being "finished"

Additionally, there were other factors which reasonably indicated  the equivalent of formal arrest  The police audio-taped his statements from the moment of contact. .He was placed in an interrogation room with a one-way mirror. He was videotaped.  The police took his photograph.

The police took his fingerprints. The police took his clothing.  The police would not accept "no" for an answer from Earl, indicating they 'needed' to first finish their investigation. The police persisted with requests that he go to the main police station for the purpose of speaking with police investigators, and when he refused, police created a subterfuge to entice him. The police persisted with requests for urine and blood specimens, indicating only then would their investigation where thereby be concluded

In addition to the above, there were other indications that Earl's statements were not voluntary, and his will overborne by coercive police tactics.  No *Miranda* warnings were given. Although the police contact of seven hours was in the middle of the night,  the police ignored his stated need to sleep. Earl had no outdoor clothing on a cold night in Anchorage Alaska, no means of travel, and had been dispossessed of home and clothing.  No arrangements were made to get Earl his coat even though he started asking for it in the first half-hour of  his contact with the police. Furthermore, the police perceived that Earl was intoxicated.

Had the courts considered the totality of the circumstances presented, reasonable jurists would have only agreed that a reasonable person, in Jack Earl's circumstances would have not believed himself free to go. Similarly, reasonable jurists would not disagree that the circumstances of his custody were coercive, and that his admissions were not freely and voluntarily made.

The trial court's error in failling to suppress Earl's statements and the evidentiary fruits therefrom requires reversal of Earl's conviction. The state relied heavily on Earl's statements at trial. There were no other witnesses to the crime, and  the video-  audio tapes, and transcripts

28

dominated Earl's second trial, as it had the first, and were the focus of the prosecutor's arguments to the jury.

### V.  THE LACK OF VOLUNTARY CONSENT TO THE SEIZURE OF BLOOD AND URINE SPECIMENS

**A.**    **Summary**

Mr. Earl contends  the police impermissibly obtained blood and urine samples from him following the police interrogation. Although he gave written consents for such specimens, the written consents were invalid because they were not voluntarily he did act voluntarily. The taking of bodily fluids without a valid consent is a search of a person which requires a warrant. *Schmerber v. California*, 384 U.S. 757 (1966)

The questions considered  here are whether the state court determination that Mr. Earl voluntarily consented to providing blood and urine specimens (and the results of their testing) an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court.  28 U.S.C. § 2254(d)(1) and (2).

**B.**    **State Court Decisions**

1.    The Trial Court Ruling

Following an evidentiary hearing on Mr. Earl's three motions to suppress, Judge Rowland ruled from the bench on all of them. His ruling on the motion to suppress the fruits of Mr. Earl's consent consisted of one phrase, "his consents to the search and seizures were likewise voluntary." .

2.    The Court of Appeals' Unpublished Memorandum Decision

In *Earl v. State*, 1997 WL 661175 ( Alaska App. 1997), the appellate court ruled,

> We conclude that Judge Rowland did not err in determining that Earl consented. The record establishes that Earl refused to consent to a search initially. However, after some discussion, Earl agreed to allow the police to obtain blood and urine samples. Earl signed a consent to search form. The record shows that the officer who showed Earl the consent form specifically told Earl that he had a constitutional right not to have a search made of his blood and urine and told Earl that he had a right to refuse to consent to such a search. The record supports Judge Rowland's conclusion that Earl ultimately consented to the search.

(Ex. F.1)

　　　3.　　　<u>On Remand in the Trial Court</u>

Back in the trial court, Mr. Earl reiterated his motions to suppress before a newly assigned Superior Court judge, Judge Sanders. The trial court deferred to the court's earlier rulings, indicating that it was a settled issue, which had been preserved. (Ex. D)

**C.**　　　**<u>The Factual Record</u>**

This argument utilizes the same factual record as provided in the preceding section concerning the coercive nature of the police contact with Mr. Earl.

**D.**　　　**<u>Analysis</u>**

The police impermissibly obtained blood and urine samples from him following the police interrogation. Although he gave written consents for such specimens, the written consents were invalid because Mr. Earl had been subjected to coercion on the part of the police. Among the most significant of the circumstances to be considered in this regard was Mr. Earl's refusal to give specimens as requested, and the police conduct in persisting with their request.　　The taking of bodily fluids without a valid consent is a search of a person which requires a warrant. Schmerber v. California, 384 U.S. 757 (1966) No warrant was obtained here.

Based upon the same circumstances identified in the previous argument, the state court determination that Mr. Earl voluntarily consented to providing blood and urine specimens (and the results of their testing) was an unreasonable application of clearly established law as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court  28 U.S.C. § 2254(d)(1) and (2). .

## VI. CONCLUSION

For the above stated reasons, habeas relief should be granted.

DATED this 29th day of January, 2007.

> Respectfully submitted,
> FEDERAL PUBLIC DEFENDER
> FOR THE DISTRICT OF ALASKA
>
> /s/ Mary C. Geddes
> Assistant Federal Defender
> Alaska Bar No. 8511157
> 601 West 5th Avenue, Suite 800
> Anchorage, AK  99501
> Ph:  (907) 646-3400
> Fax:  (907) 646-3480
> mary_geddes@fd.org

Certification:

I certify that on January 29, 2007, a copy of the foregoing document, with attachments, was served electronically on:

Kenneth M. Rosenstein, Esq.

/s/ Mary C. Geddes