Kenneth M. Rosenstein
Assistant Attorney General
Office of Special Prosecutions and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: ken_rosenstein@law.state.ak.us

Attorney for Respondent

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| JACK L. EARL, JR., | ) | |
| | ) | |
| Petitioner, | ) | No. 3:02-cv-224-HRH |
| | ) | |
| vs. | ) | |
| | ) | RESPONSE TO BRIEF ON THE |
| CRAIG TURNBULL, | ) | MERITS AND |
| | ) | MOTION TO DISMISS |
| Respondent. | ) | |
| | ) | |

Earl was convicted in state court of the 1993 murder of his roommate, Jeffery Ricker. *Earl v. State*, Mem. Op. & J. No. 4555, 2002 WL 531097, *1 (Alaska App., April 10, 2002) ("*Earl II*"). He has filed a federal habeas petition, asserting that his federal constitutional rights were violated. Earl has briefed the merits of four claims:

1.    his right to a fair trial was violated by the locations of judicial service officers during the testimony of one of defense witnesses who at the time were incarcerated;

2.    various statements he made to the police violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966);

3.    his statements were involuntary in violation of the Fifth Amendment; and

4.    his consent to provide blood and urine samples was involuntary and that the seizure of those samples therefore violated the Fourth Amendment.

The respondent will first provide a brief summary of Earl's case in state court.  Then he will address the merits of the first three of Earl's claims.

The respondent will not respond to the merits of Earl's Fourth Amendment claim.  Instead, the respondent moves to dismiss that claim and devotes the last section of this memorandum to supporting that motion.[1]

Factual and Procedural History

Earl was convicted of first-degree murder for stabbing to death his roommate, Jeffery Ricker.  *See Earl II*, 4555, 2002 WL 531097, *1.

---

[1]    The respondent reserves the right to respond to the merits of Earl's Fourth Amendment claim in the event the court denies the motion to dismiss.

Around 11 p.m. on December 31, 1993, Earl called 911 to report that he had returned to his apartment in Anchorage and found Ricker dead. *Earl v. State,* Mem. Op. & J. No. 3672, 1997 WL 661175, *1 (Alaska Court of Appeals, October 22, 1997) ("*Earl I*"). Anchorage Police Officer Matthew Dahl was dispatched to the scene and found Earl intoxicated and with blood on his pants and boots. *Id*. Ricker was on the floor lying in a pool of blood, his face covered, a pair of scissors in his chest. *Id*.

Earl told Officer Dahl that he had returned to the apartment an found Ricker dead. *Earl I*, 1997 WL 661175, *1. He said he knew nothing about how Ricker had died. *Id*. Earl agreed to go to a police substation so he could use the bathroom. *Id*. The officer assured Earl that he was not under arrest. *Id*.

At about 12:40 a.m., Earl agreed to go to the main police station with Sergeant Mike Grimes, who, assisted by other officers, interviewed Earl. *Earl I*, 1997 WL 661175, *1. He initially gave them the same story he had given Officer Dahl, but then his story began to change. He now told the police that when he returned to the apartment he had to kick in the door because Ricker had refused to let him in. He said that Ricker then attacked him with a knife. According to Earl, he responded by disarming Ricker, in the process of which Ricker was stabbed. He also said that he had not killed Ricker "on purpose" and that he had hit Ricker a lot and kicked him in the head. *Id*. Earl did not explain how Ricker was stabbed with the scissors. *Id*.

An autopsy revealed that Ricker had suffered four sharp-force wounds to his chest. Ricker was stabbed three times in the heart with the scissors. He was also stabbed once with a thin-bladed knife that nicked his heart and hit his liver. These wounds probably caused Ricker to die within minutes after they were inflicted.

In addition, Ricker suffered 22 separate blunt-force injuries. He had several teeth knocked out with such force that it caused tearing and bruising to the inside of his mouth and to his lip. Ricker also had blunt-force injuries to his nose, left eye, forehead, and face. Imprinted on Ricker's shoulders and the side of his head and forehead was the pattern from Earl's boot soles. DNA testing of bloodstains on Earl's boots established that it was consistent with Ricker's DNA.

Earl was convicted of first-degree murder after a jury trial and sentenced to 99 years' imprisonment. *See Earl I,* 1997 WL 661175, *1. Earl appealed, arguing that his statements to the police and his blood and urine samples should have been suppressed. The Alaska Court of Appeals rejected both claims but reversed Earl's conviction due to the erroneous admission of evidence of his 1991 assault conviction. *Id*. at *3-5, *6. Earl filed a petition for hearing on the suppression ruling, which the Alaska Supreme Court denied. *See Earl v. State,* No. S-8363 (Alaska, March 9, 1998).

Earl was retried in 1999 and was again convicted and sentenced to 85 years' imprisonment. He appealed again, and the Alaska Court of Appeals

affirmed his conviction and sentence. *Earl II*, mem. op. at *1. Earl then filed a petition for hearing, which the Alaska Supreme Court denied. *See Earl v. State,* No. S-10585 (Alaska, July 2, 2002).

Earl filed a pro se petition for writ of habeas corpus, asserting six claims: (1) he was coerced into consenting to give blood and urine samples; (2) the police obtained statements from him in violation of *Miranda*; (3) the state trial court refused to allow him to send the murder knife out-of-state for testing; (4) he was entitled to a mistrial because defense witnesses, who were incarcerated at the time of trial, were subjected to the distinctive placement of judicial service officers; (5) he was denied the opportunity to impeach a prosecution witness with evidence that she had allegedly been assaulted by Ricker; and (6) his sentence was excessive. Earl's lawyer filed an amended petition incorporating the same six claims.

In response to the respondent's motion for more definite statement, Earl abandoned his third, fifth, and sixth claims. He also clarified his fourth claim, asserting that he was entitled to a mistrial because of the prejudice purportedly resulting from two events at trial. [Clarification of Ground Four at 2, dated March 4, 2003] The first event took place when judicial service officers moved into positions closer to the jury when Earl and two other incarcerated defense witnesses testified. The second event took place during the testimony of one of those witnesses, Cyrus Reape, who, when asked by the prosecutor

whether he had lived with Earl in the "same building," responded that they had lived in the "[s]ame facility, not the same building." This court has previously ruled that only the first event – the placement of the judicial service officers – is cognizable under 28 U.S.C. § 2254.

<u>Response to Brief on the Merits</u>

A.    <u>Earl has not demonstrated that the state court's decision regarding the placement of judicial service officers was contrary to or amounted to an unreasonable application of clearly established federal law</u>

Earl asserts that he is entitled to habeas relief because the placement of judicial service officers during the testimony of two defense witnesses and his own testimony violated his right to a fair trial. [Pet. Br. 5 ff.] The Alaska Court of Appeals described the trial proceedings as follows:

> Earl testified on his own behalf and also presented testimony from David Lewis and Cyril Reape. All three were in custody at the time they testified. Before Lewis testified (the first of the three to testify), Earl objected to the positioning of one of the judicial service officers in the courtroom. The officer sat near the door the jurors used to enter and leave the courtroom. Judge Sanders overruled the objection. Earl did not object to the positioning of the officer when Reape and Earl testified.

> During the rest of trial, an officer was placed at the right of the defense's table and another officer was at the left of the prosecutor's table. The record does not reflect whether the officer located by the jurors' door was an additional officer or one of the two officers present during the whole trial.

*Earl II*, 2002 WL 531097, *5. When Earl concluded his own testimony, he moved

for a mistrial. He based his request on the movement of the judicial service

officers during the testimony of Lewis and Reape and his own testimony, which,

according to Earl, had implied to the jury that the witnesses were in custody.

[Exh. E (Tr. 2151-52)[2]] The trial court denied the motion.

*Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340 (1986), provides the

clearly established federal law that controls Earl's claim. The defendant in

*Flynn* claimed that he was denied a fair trial by the presence of four uniformed

officers in the front row of the spectator section of the courtroom. The Supreme

Court rejected the claim.

"Central to the right to a fair trial" is a defendant's right to have the

charge against him decided solely on the basis of evidence presented at trial and

not on some extrinsic basis, such as his "continued custody." *Flynn*, 475 U.S. at

567, 106 S.Ct. at 1345. Though not every practice that tends to single out a

defendant will infringe his right to a fair trial, some are inherently prejudicial

and must be subjected to "close judicial scrutiny." *Id*. at 567-68, 106 S.Ct. at 134

(quoting *Estelle v. Williams*, 425 U.S. 501, 503-04, 96 S.Ct. 1691, 1692-93

(1976)). *Williams* involved one such inherently prejudicial practice, where the

---

[2]    When referring to the transcripts of proceedings included in Earl's exhibits, the respondent will specify the exhibit number and the original transcript page number.

defendant was forced to appear before the jury in prison clothes; this promoted no essential state policy and discriminated against the indigent who could not afford bail. *Williams*, 425 U.S. at 504-06, 96 S.Ct. at 1693-94, *cited in Flynn*, 475 U.S. at 568, 106 S.Ct. at 1345. In contrast, binding and gagging a defendant, though inherently prejudicial, was not so prejudicial when the defendant was "particularly obstreperous and disruptive." *Flynn*, 475 U.S. at 568, 106 S.Ct. at 1345 (discussing *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057 (1970)).

The use of security officers during a trial, however, does not amount to an "inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Flynn*, 475 U.S. at 568-69, 106 S.Ct. at 135-46. The chief feature of the use of in-court security officers that distinguishes it from an inherently prejudicial practice "is the wider range of inferences that a juror might reasonably draw from the officers' presence." *Id.* at 569, 106 S.Ct. at 1346. Shackling and prison clothes give the jury an "unmistakable indicatio[n] of the need to separate a defendant from the community at large." *Id.* The presence of officers, on the other hand, is ambiguous. *Id.* Indeed, "society has become inured to the presence of armed guards in most public places." *Id.* Though the Court recognized the possibility that the presence of officers in a courtroom could create an impression that a defendant was dangerous or untrustworthy, it refused to establish a

presumption that any presence of uniformed officers is inherently prejudicial. *Id*.

The Court also discussed the function of a federal habeas court in reviewing a claim such as Earl's. A habeas court does not determine "whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom." *Flynn*, 475 U.S. at 572, 106 S.Ct. at 1347. Instead, the court "look[s] at the scene presented to the jurors and determine[s] whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Id*. If the practice is not inherently prejudicial and if the defendant has not shown actual prejudice, then the "inquiry is over." *Id*., 106 S.Ct. at 1348.

The discussion in *Flynn* of the function of a habeas court predates Congress' enactment of Antiterrorism and Effective Death Penalty Act of 1996. The AEDPA made fundamental changes to the role of federal habeas court's in reviewing state court convictions. Under the revised standards, a habeas court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). It is no longer sufficient for a habeas court to rely on its independent analysis to reach a conclusion different from the state court's. *See Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 2150 (2004) ("We cannot grant relief under

AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."). To grant habeas relief now requires a conclusion that the state court result is contrary to or the product of an unreasonable application of Supreme Court precedent.

Earl asserts that the change of position of one judicial service officer during his testimony and the testimony of Lewis and Reape is the legal equivalent of shackling a defendant or forcing him to wear prison clothes and is therefore an inherently prejudicial practice. [Pet. Br. 10] This begs the question. Earl cites no clearly established federal law, i.e., a decision by the United States Supreme Court, that even suggests support for this assertion. *Flynn*, as noted above, holds just the opposite – the presence of officers in a courtroom is not presumptively prejudicial. Indeed, Earl cites no authority from *any* federal court suggesting that a security officer who changed position during the testimony of the defendant (or a witness who was in custody) engaged in an inherently prejudicial practice that presumptively violated the defendant's right to a fair trial.

Having failed to show that clearly established federal law classifies the action he challenges as inherently prejudicial, Earl must show that he was actually prejudiced by that action. He has not done that. Accordingly, the federal habeas inquiry is over, and his claim must be denied.

Earl also argues that the state court's relied on an unreasonable determination of the facts in light of the evidence. [Pet. Br. 12] Specifically, he asserts that the Alaska Court of Appeals "presumed factual findings which were never made," i.e., that it was necessary to have some security while Earl, Lewis, and Reape testified. [*Id.* (citing *Earl II*, 2002 WL 531097, *6)] This puts the cart before the horse. Under *Flynn*, before the burden shifts to the state to justify the challenged practice, the defendant must first persuade a court that the practice is inherently or actually prejudicial. *See Flynn*, 475 U.S. at 568-72, 106 S.Ct. at1345-48 (if practice is not inherently or actually prejudicial, inquiry of federal habeas court is over). Earl did neither; thus, any factual justification relied upon by the Alaska Court of Appeals is immaterial to federal habeas review.

B.    Earl has not demonstrated that the state court's decision regarding the absence of *Miranda* custody was contrary to or amounted to an unreasonable application of clearly established federal law

Earl next claims that his statements to the police should have been suppressed because he did not receive *Miranda* warnings. [Pet. Br. 13 ff.] The Alaska Court of Appeals affirmed the trial court's conclusion that Earl made his statements during a noncustodial interrogation and therefore *Miranda* warnings were not required. *Earl I*, 1997 WL 661175, *2-4.

The United States Supreme Court has outlined the clearly established law governing a determination of *Miranda* custody in the context of

federal habeas review. *See Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140. A custodial interrogation is police questioning that takes place "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966), *quoted in Alvarado*, 541 U.S. at 661, 124 S.Ct. at 2147. Interrogation is noncustodial where "there is 'no indication that the questioning took place in a context where [the suspect's] freedom to depart was restricted in any way.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714 (1977) (per curiam), *quoted in Alvarado*, 541 U.S. at 661, 124 S.Ct. at 2148. And a noncustodial interview does not become custodial by merely taking place in a coercive environment since any police interview of a crime suspect "will have coercive aspects to it." *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

"The ultimate inquiry is simply whether there is a formal arrest, or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983) (per curiam), *quoted in Alvarado*, 429 U.S. at 662, 124 S.Ct. at 2148. And in conducting that inquiry the only relevant consideration "is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3152 (1984), *quoted in Alvarado*, 429 U.S. at 662, 124 S.Ct. at 2148.

In other words, a court faced with having to determine *Miranda* custody "must examine 'all the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Alvarado*, 429 U.S. at 663, 124 S.Ct. at 2149 (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325, 114 S.Ct. 1526, 1530 (1994 (per curiam)). This involves "[t]wo discrete inquiries . . . : first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465 (1995), *quoted in Alvarado*, 541 U.S. at 663, 124 S.Ct. at 2149. The answers to these questions then leads to the ultimate inquiry: whether, objectively viewed, the defendant was subjected to a "formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id*. This determination is made from the perspective of a reasonable innocent person in the same circumstances as the defendant. *Cf. United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005) (discussing when investigative stop ripens into full arrest).

The foregoing outline of the principles governing *Miranda* custody applies when a court is assessing a defendant's interrogation on direct review. On habeas review, the analysis is different. A federal court may not grant federal habeas relief based on its "independent inquiry into whether the state

court was correct as a *de novo* matter." *Alvarado*, 541 U.S. at 665, 124 S.Ct. at 2150. Rather, federal habeas relief is available "only if the state court's decision is objectively unreasonable" under the law clearly established by Supreme Court precedent. *Id*. Given that precedent, the state courts' conclusion that Earl's interview was noncustodial is not objectively unreasonable.

To support his claim that he was in *Miranda* custody, Earl presents a four-page list of facts that he asserts "makes clear" that he was in custody and therefore entitled to suppression of his statements. [Pet. Br. 20-24] The problem with this list is that it ignores crucial circumstances that provide an objective counterweight to his claim and that establish the objective reasonableness of the state courts' conclusion that Earl was not in custody. Earl focuses on specific aspects of his situation, implying that he expects this court to independently determine whether he was in custody. But as noted above, such an independent review is beyond the scope of a federal habeas court. *See Alvarado*, 541 U.S. at 665, 124 S.Ct. at 2150.

Earl asserts that he agreed to be taken to the police substation only so that he could use the bathroom there and not so he could be interviewed. But at no time did Earl place any conditions on his willingness to go to the substation. When Officer Dahl offered Earl the use of the bathroom at the

substation, Earl asked whether he was under arrest. [Exh. B.6, p. 3[3]] The officer told Earl he was not: "No sir you are not under arrest." [*Id.*] The officer then explained that he still needed to talk to Earl: "[I]t's just that whenever . . . ." [*Id.*] Earl interrupted the officer to say that he urgently had to urinate and then, "Okay go-go-go." *Id.* The officer then finished the statement that Earl had interrupted: "No sir you are not under arrest, its [*sic*] just that whenever we do have any kind of crime like this we need to talk to people there were there or [not transcribed] as much information as possible." [*Id.*]

---

[3]      When referring to the interview transcripts included in Earl's exhibits, the respondent will specify the exhibit number and the page number assigned by Earl.  Earl's numbering appears to be inconsistent.  Sometimes he relies on the Bates-stamped numbers and other times he relies on the numbering he added in preparing the exhibits, which appears to coincide with the numbering assigned by the transcriptionist.

       Earl's conversations at the substation with Officer Dahl and other officers were recorded on two different tape recorders and appear in two separate transcripts.  The initial recording was recorded by Dahl on a portable recorder. [*See* Exh. B.6, pp. 1-13]  When they arrived at the substation, Dahl switched to the other recorder.  [*See* Exh. B.6, pp. 19-38]  When Earl went outside to smoke, Dahl switched back to the portable recorder.  [*See* Exh. B.6, pp. 13-16]  After Earl finished smoking, the recording resumed on the other recorder.  [*See* Exh. B.6, pp. 38-44]  When Earl went outside for second cigarette, Dahl again switched back to the portable recorder.  [*See* Exh. B.6, pp. 16-18]  And when Earl finished, the recording again switched back to the other machine until Earl left to go to the main police station.  [*See* Exh. B.6, pp. 44-46]

When they arrived at the substation, Officer Dahl pointed out the bathroom.[4]  [Exh. B.6, p. 6]  But before Earl would go into the bathroom, it was he who initiated the discussion about his interaction with Ricker: "Just let me clear one thing up."  [*Id*.]  He then pointed to blood on his pants and explained that he and Ricker had been involved in an argument where Ricker accused him of stealing cocaine and Earl had broken an ashtray, cutting his hand in the process.  [Exh. B.6, pp. 6-7, 8]

After further discussion, Officer Dahl again assured Earl he was not under arrest: "You understand you're not arrest [*sic*]."  [Exh. B.6, p. 19]  Earl gave a response that was not transcribed, and the officer explained, "We're just tryin' to get . . . ."  [*Id*.]  Earl responded, "Yeah that's okay."  [*Id*.]  After more questioning, an unidentified officer asked Earl if he would be willing to go to the main police station and, at the same time, assured Earl for the third time that he was not under arrest.  [Exh. B.6, p. 33]  The officer explained that the investigators who would bear ultimate responsibility for the case were located at the main station.  [*Id*.]  Earl responded, "Yeah."  [*Id*.]

---

[4]    The transcript attributes to Officer Dahl a statement about removing handcuffs from Earl.  [*See* Exh. B.6, p. 5]  This is a transcription error.  [*See* Exh. C (Tr. 83-84)]  Earl conceded that there was no evidence that he had been handcuffed.  [Exh. C (Tr. 213)]

When Earl said that he wanted to return to his apartment, he was told that he could not "because it's a crime scene." [Exh. B.6, p. 34]  The officer told him that they would give him a ride "any place you need," but Earl said he had "no place to go" except to his apartment.  [*Id*.]

Apparently responding to the request to go to the main police station, Earl asked if he could "do it tomorrow morning early." [Exh. B.6, p. 34] One of the officers explained that it was important to conduct the investigation promptly, when "things are really fresh in people's mind," and that the officers knew Earl had likely seen things that might help them to solve the case.  [*Id*.] An officer told Earl for the fourth time that he was not under arrest and that he did not have to talk to anybody if he did not want to.     [Exh. B.6, p. 35]  Earl eventually told the officers that he did not want to go to the main station.  [*Id*.] An officer responded, "Okay.  That's fine – that's fine.  That's your choice." [*Id*.] A short time later, Earl asked, "I'm under arrest right?"  [Exh. B.6, p. 38]  An officer responded, "No you are not under arrest."  [*Id*.]

During a cigarette break, Earl asked where he was going to go (because he could not return to his apartment).[5]    An officer then told Earl for

---

[5]    The transcript incorrectly quotes Earl as saying, "When am I going to go?"  [*See* Exh. B.6, p. 13]  On the actual recording from which the transcript was made, Earl distinctly asks, "Where am I going to go?"  The respondent has lodged a copy of this recording with the court.

the fifth time that he was not under arrest and that he was "free to leave any time." [Exh. B.6, p. 14] The officer again explained that it would benefit the investigation if Earl would talk to the investigators just in case he were to later "disappear somewhere." [*Id.*] Earl said that he had nowhere to go. [*Id.*]

One of the officers told Earl that Jamie Greene, a woman who lived in the apartment with Earl and Ricker, was upset about Ricker's death and was on her way to the main police station. [Exh. B.6, pp. 44-45] The officer asked Earl if he would mind meeting her at the station; Earl agreed. [Exh. B.6, p. 45]

Anchorage Police Sergeant Mike Grimes drove Earl to the main station. [Exh. B.6, p. 46] Earl was not handcuffed and sat in the front seat of Sgt. Grimes's car. [Exh. C (Tr. 158)] When they arrived at the main station, Earl was unable to see Greene because she was being interviewed by other officers. [Exh. C (Tr. 201-03)] Earl was taken to an interview room where Detective Nancy Potter asked if needed anything. [Exh. B.8, p. 1] Earl asked for his coat and was told that it would be a while before the officers could retrieve it from his apartment. [*Id.*] Sgt. Grimes took Earl to an interview room and told him (for the sixth time) that he was not under arrest and that if he did not want to answer questions, then he should just say so, and he would be "free to go." [Exh. B.8, pp. 2-3] Earl responded, "I'll just tell you whatever I know." [Exh. B.8, p. 3] Sgt. Grimes *again* told Earl he was not under arrest or charged with a crime and that no matter what he said during the interview, he would be

free to go.  [*Id.*]  Earl was also told that he did not have to answer questions.
[Exh. B.8, p. 6]

When, during the course of the interview, Earl was confronted about
the apparent large amount of blood on the bottom of Earl's boots, Sgt. Grimes
*again* told Earl that he would be free to leave regardless of what he might say
during the interview.  [Exh. B.8, pp. 26-27]  At that point, Earl began to
acknowledge responsibility for Ricker's death.  [Exh. B.8, p. 28]  After Earl
provided details about his confrontation with Ricker, Sgt. Grimes told Earl that
he would not be going to jail that night.  [Exh. B.8, p. 45]  When Sgt. Grimes
challenged Earl's claim that Ricker had threatened him with a knife, Earl
wanted to reenact the confrontation with Grimes playing Ricker's part.
Exh. B.8, p. 36]  When Earl apparently stood up to do this, Sgt. Grimes said,
"[W]e're not gonna do anything crazy," and then told Earl, "Sit back down."  [*Id.*]

One of the detectives explained that processing the crime scene
would likely take all night and that they would retrieve some clothes and shoes
for Earl to wear because they had to seize the blood-covered clothes he was
wearing.  [Exh. B.8, pp. 47-48]  Det. Potter asked if there was someone with
whom Earl could stay until he could return to his apartment.  [Exh. B.8, p. 48]
Earl said there was no one.  [*Id.*]  Det. Potter told Earl (for the eighth time) that
he was not under arrest, that would be free to leave, and that the police would
give him a ride to wherever he wanted to go (except back to the crime scene).

[Exh. B.8, p. 49]  Sgt. Grimes also told Earl that some clothes would be brought to him from the apartment.  [Exh. B.8, p. 48]  He also told Earl yet again (the ninth time) that he was not under arrest and could leave at any time after the police got him a change of clothes.  [Exh. B.8, p. 55]

Several hours later, after the police had obtained physical evidence from Earl, including blood and urine samples, Earl could not return to his apartment because it was still being processed.  [Exh. C (Tr. 182)]  Because Earl had no money and could not think of anywhere to go, the Sgt. Grimes tried to take him to the Anchorage Rescue Mission, but it would not accept Earl.  [Exh. C (Tr. 181-82)]  Sgt. Grimes gave Earl some money and took him to a restaurant at Minnesota Drive and Benson Avenue.  [Exh. C (Tr. 182-83)]  Three hours later and still at the restaurant, Earl telephoned Sgt. Grimes, asking when he could return to his apartment.  [Exh. C (Tr. 183)]  Sgt. Grimes returned to the restaurant, gave Earl some more money, and told him to eat lunch. [Tr. 183-84]  When the crime scene was released, Sgt. Grimes went back to the restaurant and took Earl to his apartment. [Tr. 185]  Earl was arrested later that afternoon after the police obtained a warrant.  [*Id*.]

Based on this record, the state trial court concluded that Earl "was not placed in custody formally.  He was constantly assured that he was not under arrest, that there was no de facto custody here, . . . that there wasn't a psychological equivalent of custody," and a reasonable person, under the

circumstances, would not "have felt that they were in custody or not free to leave." *Earl I*, 1997 WL 661175, *3. [*See also* Exh. C. (Tr. 226-27)]

The Alaska Court of Appeals affirmed the trial court's conclusion. *Earl I*, 1997 WL 661175, *3. The court acknowledged the correct federal standard: "Only a restraint of a 'degree associated with formal arrest' will constitute *Miranda* custody." *Id.* at *2 (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520). The court noted the following aspects of Earl's contact with the police as supporting the trial court's conclusion: (1) Earl was never physically restrained; (2) there were no circumstances indicating the "equivalent of physical restraint"; (3) the tone of the interview was cordial and, though at times confrontational, calm and never hostile; and (4) Earl was assured numerous times that he was not under arrest, he could end the interview at any time, and that when it ended, he would be released regardless of any statements he made. *Id.* at *4. It was those constant assurances that figured most prominently in supporting the conclusion that a "reasonable person in Earl's position would have understood that he was free to break off police questioning and leave." *Id.*

Earl's analysis of the state court rulings is flawed and does not satisfy his burden under 28 U.S.C. § 2254(d). First, he argues that the trial court erroneously considered his subjective belief that he was not in custody. [Pet. Br. 24] Though the court did mention Earl's subjective belief, it is clear that the court ultimately and correctly applied an objective standard: "I don't

believe that a reasonable person would have felt that they were in custody or not free to leave." *Earl I*, 1997 WL 661175, *3.

Second, Earl argues that, although the Alaska Court of Appeals identified the correct governing principle, it "unreasonably applied the principle to the facts" of Earl's case. [Pet. Br. 25]  In attempting to advance this aspect of his argument, Earl appears to focus only on those facts that, in isolation, suggest custody, while he ignores other facts that suggest the contrary.

Earl points to the seven-hour duration of his contact with the police, which he asserts implied that he was in custody. [Pet. Br. 26]  But any custodial implication was rebutted by the numerous times he was told that he was not under arrest and could leave whenever he wanted.

Earl also claims that though the police repeatedly assured him he could leave, they "consistently postponed that release" until they deemed their investigation complete. [Pet. Br. 25]  The only instance of this that Earl cites is when Sgt. Grimes said, "[Y]ou're walkin' outta here when we're done." [*Id.* (citing Exh. B.8, p. 130)]  But Earl incompletely relates this instance by omitting Sgt. Grimes's two follow-up statements: "You're walkin' outta here *any time you want.*  You can leave *right now*." [Exh. B.8, p. 130 (emphasis added)]

Earl obviously intends that that this court should infer from his assertion that the police consistently postponed his release that they somehow thwarted his desire to end the interview and leave.  But at no point during the

interviews did Earl give any indication that he wanted to leave.  Though the police certainly would have wanted to continue the interview until they felt they had sufficient information, nothing in the record suggests that they engaged in any conduct to delay Earl's intent to leave.

Earl also claims that the police, by purportedly ignoring his refusal to provide blood and urine samples and persisting in attempting to obtain his consent, "once again postpon[ed] his release" until he agreed to submit.  [Pet. Br. 25]  The record simply does not support this interpretation.  Though Earl initially and emphatically refused to consent, Sgt. Grimes did little more than explain to Earl why he wanted the samples:

> Q:    [by Sgt. Grimes]   Here's another thing I wanta do tonight too . . . you said you'd been drinkin'
>
> A:    [by Earl]  Yes sir.
>
> Q:    OK  What we need to do and this is take you down . . .
>
> A:    No chance.
>
> Q:    . . . Have your blood and urine?
>
> A:    No!
>
> Q:    OK
>
> A:    Cannot.  Will not.
>
> Q:    How come?  Because that goes to help you, if you were under the influence of su'um, it helps you . . . it doesn't hurt you.

A:    I already done told you I was drunk as shit.

Q:    Well, we need to find you y'know right now what your
      blood alcohol level is . . . so we need to get a blood and
      urine sample, OK?

A:    Huh uh.

Q:    Huh?  We we were hopin' to do it y'know with your
      permission if you'd cooperate with us . . . you've been
      great so far . . . OK?  If you . . . OK . . .

A:    Yeah [not transcribed]

Q:    I have a legal obligation to find out.

A:    OK.  Fine take it.

        .        .        .        .

Q:    OK.  But what I'm sayin' is . . . we like to do it with
      your . . .

A:    I'm screwed brother, I'm tellin' you right now . . .

Q;    I don't know what's gonna happen yet.  .  .  .  I don't
      want to coerce you into giving your consent, OK?

[Exh. B.8, pp. 56-57]  Sgt. Grimes was careful to explain to Earl why the police

wanted the samples, and he specifically told Earl that they did not want him to

feel compelled to consent.  This exchange cannot reasonably be interpreted as an

effort to postpone Earl's release; it was instead a reasonable effort to obtain

Earl's voluntary consent.

        Two other facts that Earl claims show that he was in custody are

that he agreed to go to the police substation only so that he could use the

bathroom and go to the main station only to see Greene; in neither instance was he agreeing to be interviewed. [Pet. Br. 25]  While those might have been Earl's motives for going with the officers, the record does not suggest that he ever attempted to limit his presence to only those purposes.  Earl's implication that the police had used Greene's presence at the main station as a ruse is belied by the fact that at no time in the recording of the interview did he ask about Greene's condition or when he would get to see her.

Moreover, at no time did Earl express any reluctance to respond to the officers' questions, express any desire to end the interview, or otherwise attempt to limit the purpose of his presence.  Had Earl reasonably believed that the officers had exceeded any limits he might have imposed on his willingness to cooperate, he would have said something to that effect; he said nothing.

Another fact he asserts is that he was never outside the presence of the officers. [Pet. Br. 26]  There were good reasons for this.  First, Earl's blood-stained clothes constituted evidence.  Until he could be provided with a change of clothes, keeping him under observation prevented him from tampering with that evidence. [*See* Exh. C (Tr. 137)]  Second, Earl was in a police station.  While he could not roam at will, the police made no effort to restrain Earl's freedom of movement in any fashion.  Any restriction inhering in his presence at the station is not a type of restraint associated with formal arrest.

Earl also cites a variety of instances where his freedom of action was purportedly curtailed. [Pet. Br. 26-27] For instance, he was placed in the back of a locked patrol car for the ride to the substation. [*Id.*] But as Officer Dahl explained, the front seat of his car, which he treated as his office, was filled with various work items that he would have had to move to make room for Earl. [Exh. C (Tr. 82)] Earl also cites the officer's response, "I don't know," to his purported question, "When am I going to get going?" as evidence of that he was in custody. [Pet. Br. 27 (referring to Exh. B.6, p. 13)] But as noted above, Earl's statement was mistranscribed; the actual recording reveals that he asked, "Where am I going to go?" *See, supra*, p. 2 n.5.

According to Earl, another apparent indication that he was in custody that was ignored by the state courts was the fact that the police recorded the interviews at both the substation and main station. The recording was simply careful police work and was mandated as a prerequisite of admissibility. *See Stephan v. State*, 711 P.2d 1156, 1159 (Alaska App. 1985) (recording of suspect's interrogation is requirement of state due process when interrogation occurs at place of detention and recording is feasible). Earl fails to explain how the recording of the interviews operated to restrain him.

Earl also cites the collection of evidence from him – photographing and fingerprinting and taking his clothes – as evidence of custody. [Pet. Br. 27-28] Earl does not challenge the collection of this evidence (nor could he

reasonably do so). Nor does Earl explain how the collection of evidence from a person who was at the very least a witness in a homicide case operates as a restraint associated with formal arrest. He fails to explain how the evidence collection would be reasonably associated with formal arrest, particularly when joined with the constant assurances that he was not under arrest and could leave whenever he chose.

Last, Earl cites his requests for a jacket, his expressed desire to sleep, his lack of means of transport, his inability use the bathroom in his apartment, and his inability to return to it as further custodial circumstances that the state courts ignored. [Pet. Br. 27-28] The record does not objectively support any of these claims.

Earl ignores the obvious: his apartment was a crime scene. Allowing him to enter, whether to use the bathroom or to retrieve clothing, could have contaminated the scene and compromised the ability of the police to conduct their investigation and to process the apartment for evidence. Preventing Earl from entering the apartment had nothing to do with any effort to restrict his freedom of movement and everything to do with protecting the integrity of the crime-scene investigation. A reasonable person would understand that he could not enter the apartment until after the police completed their investigation and would not associate that restriction with formal arrest. That Earl could not return to his apartment did not signify custody; he was free to go anywhere else

he chose.  Restricting Earl from returning to his apartment is not a type of restraint associated with formal arrest.

Though Earl told the police that he was tired, at no time did he indicate that he was too tired to continue.  Further, nothing in the record suggests that the police did anything to prevent him from sleeping.

Another notable aspect of his encounter with the police that Earl overlooks is that he was never frisked for weapons.  As they entered the substation, Officer Dahl asked, "I forgot, you have any guns on you?"  [Exh. B.6, p. 6]  And much later, without any request from an officer, Earl voluntarily surrendered his pocket knife.  [Exh. B.6, p. 35]

The record of the *Miranda* custody determination in Earl's case is similar to the determination in *Alvarado*.  Some facts concerning the interrogation in *Alvarado* were "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave," while "[o]ther facts point in the opposite direction."  *Alvarado*, 541 U.S. at 664-65, 124 S.Ct. at 2150.  Both here and in *Alvarado*, the interviews took place at the police station and for an extended time.  But unlike Earl, the defendant in *Alvarado* was brought to the station by his legal guardians and was never told that he was free to leave.  *Id*.  Earl, on the hand, went to station voluntarily and was told numerous times that he could leave.

Because reasonable jurists could differ over whether the defendant in *Alvarado* was in custody, the Supreme Court concluded that the state court had reasonably applied clearly established law. *Alvarado*, 541 U.S. at 664-65, 124 S.Ct. at 2149-50. It was the "differing indications," both for and against custody, that lead the court to reach that conclusion. *Id*. at 665, 124 S.Ct. at 2150. So too, in Earl's case.

Earl attempts to portray the state courts' decisions as unreasonable by focusing exclusively on those circumstances that suggest he was in custody. Those circumstances, viewed in isolation, might support a finding of custody, but when the totality of all the circumstances is considered, the conclusion that Earl was not in custody is reasonable in light of the applicable legal principles.

C.    <u>Earl has not demonstrated that the state court's decision regarding the voluntariness of his statements was contrary to or amounted to an unreasonable application of clearly established federal law</u>

A defendant's statement must satisfy two criteria to be deemed involuntary. First, it must have been the product of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986). Second, the coercive police activity must have overborne the defendant's will to resist making a statement. *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343 (1963).

The Alaska Court of Appeals affirmed the trial court's conclusion that Earl's statements were voluntary. *Earl I*, 1997 WL 661175, *5. After reviewing the record, the court could find "no evidence that the police did anything to overbear Earl's will," noting that the police did not threaten him or offer any inducements to get him to talk. *Id.* Indeed, the police were consistently cordial and assured Earl that he could leave at any time. *Id.* Further, "Earl appeared to want to be cooperative." *Id.*

In one paragraph, Earl makes the conclusory argument that his statements were involuntary because the police used coercive tactics to overbear his will to resist. [Pet. Br. 28] He supports this by asserting that he was not given *Miranda* warnings, he remained with the police for seven hours, and the police "ignored his stated need to sleep" and did nothing to get a coat for him. [*Id.*] None of these facts demonstrate that the state court's conclusion that Earl's statements were voluntary was unreasonable.

The fact that Earl remained with the police for seven hours was not coercive in light of the fact that he never once indicated a desire to stop talking despite having been given numerous assurances that he could do so at any time and leave. Indeed, as the state court observed, "Earl appeared to want to be cooperative" and to continue the interviews. *Earl I*, 1997 WL 661175, *5. That Earl wanted to sleep is also of little significance given that he never suggested that he was too tired to continue talking. This was not a situation where the

police insisted on continuing the interviews in the face of Earl's indications to the contrary; Earl never indicated a desire that the interviews end.

Earl points to nothing in the record that would suggest that the supposed refusal by the police to immediately retrieve a jacket from his apartment somehow overbore his will to resist making a statement. His lack of a jacket did not in any way make it difficult for him to stop talking. Earl appears to suggest, without citing any authority, that the police had some sort obligation, at his demand, to enter the crime scene and interrupt the processing to retrieve a jacket. Moreover, Earl did not need a jacket to end the interview and leave the police station. The officers had offered to take him wherever he wanted to go. That Earl could not think of any place other than his then unavailable apartment did not amount to coercion by the police.

Finally, the absence of *Miranda* warnings as evidence of police coercion simply begs the question.

<u>Motion to Dismiss Fourth Amendment Claim</u>

A state prisoner is not entitled to federal habeas relief based on an unconstitutional search or seizure if the prisoner had an opportunity to fully and fairly litigate his Fourth Amendment claim in state court. *Stone v. Powell,* 428 U.S. 465, 495, 96 S.Ct. 3037, 3052-53 (1976); *Siripongs v. Calderon,* 35 F.3d 1308, 1321 (9th Cir. 1994). One of the issues Earl presents in his brief is a Fourth Amendment claim that he did not voluntarily consent to provide blood and urine samples to the police. [Pet. Br. 4, 29 ff.] Before this claim is cognizable, he must first show that he was denied a full and fair opportunity to litigate that claim in state court. *Mack v. Cupp*, 564 F.2d 898, 901 (9th Cir. 1977). Earl does not acknowledge his duty to satisfy, much less even the existence of, this burden as a prerequisite to consideration of his Fourth Amendment in a federal habeas court.

In his brief, Earl asserts that the state court rulings that he voluntarily consented represent an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence. [Pet. Br. 29 (citing 28 U.S.C. § 2254(d)(1), (2))] The argument by a habeas petitioner that the state courts applied incorrect Fourth Amendment standards "goes not to the fullness and fairness of his opportunity to litigate the claim, but to the correctness of the state court resolution, an issue which *Stone v.*

*Powell* makes irrelevant." *Siripongs*, 35 F.3d at 1321.  *See also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (*Stone* doctrine requires determination whether petitioner had opportunity to litigate Fourth Amendment claim, "not whether he did in fact do so or even whether the claim was correctly decided").

Earl had a full and fair opportunity to litigate his Fourth Amendment claim in state court.  The state trial court conducted an evidentiary at which Earl presented evidence to support his Fourth Amendment claim.  [*See* Exh. C]  That evidentiary hearing and the court's findings provided a sufficient record for state appellate review.  Earl also had not one, but two, opportunities to fully present his claim to the state appellate courts.

At no time did he claim that trial court proceeding had been deficient other than having reached a result adverse to him.  The record of Earl's proceedings in the state trial court and the Alaska Court of Appeals shows that he had a full and fair opportunity to litigate his Fourth Amendment claim.  Moreover, he has made no claim in federal court that the state courts denied him a full and fair opportunity to litigate that claim.  Accordingly, Earl's Fourth Amendment claim is not cognizable in this proceeding.  *See Siripongs,* 35 F.3d at 1321.

DATED this 16th day of April, 2007, at Anchorage, Alaska.

TALIS J. COLBERG
ATTORNEY GENERAL OF
 THE STATE OF ALASKA

s/ Kenneth M. Rosenstein
   Assistant Attorney General
   Office of Special Prosecutions and Appeals
   310 K St., Suite 308
   Anchorage, Alaska 99501
   Telephone: (907) 269-6250
   Facsimile: (907) 269-6270
   e-mail: ken_rosenstein@law.state.ak.us
   Alaska Bar. No. 7605051

### Certificate of Service

I certify that on , a copy of the foregoing **Response to brief on the merits and motion to dismiss** was served electronically on **Mary Geddes**
s/ **Kenneth M. Rosenstein**