IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JACK L. EARL, JR.,<br><br>                    Petitioner,<br><br>vs.<br><br>CRAIG TURNBULL,<br><br>                    Respondent. | No. 3:02-CV-224-HRH<br><br><br>**INITIAL REPORT AND**<br>**RECOMMENDATION REGARDING**<br>**BRIEF ON THE MERITS OF THE**<br>**PETITION FOR HABEAS CORPUS**<br>**AND MOTION TO DISMISS**<br>**[DOCKETS 84 & 90]** |

## I.  PETITION AND MOTION PRESENTED

Jack L. Earl, Jr. was convicted of murder in the first degree in Alaska Superior Court for the 1993 killing of Jeffery Ricker (Case No. 3AN-S94-30 CR).  Earl appealed his conviction. Earl v. State of Alaska, No. A-6063, 1997 WL 661175, at *1 (Alaska App. Oct. 22, 1997) (hereinafter Earl I).  The Alaska Court of Appeals rejected most of Earl's claims, but agreed with one, reversing Earl's conviction due to the erroneous admission of evidence of his 1991 assault conviction.  Id. at *3-6.  Earl filed a petition for hearing with the Alaska Supreme Court regarding his rejected claims.  The Alaska Supreme Court denied his request.  Earl v. State, No. S-8363 (Alaska, March 9, 1998).

Earl was retried in 1999 and was convicted and sentenced to 85 years' imprisonment.  He appealed again on numerous grounds, and the Alaska Court of Appeals affirmed his conviction. Earl v. State of Alaska, Nos. A-7385, 4555, 2002 WL 531097, at *2-10 (Alaska App. April 10, 2002) (hereinafter Earl II).  He again filed a petition for hearing, which the Alaska Supreme Court denied.  Earl v. State, No. S-10585 (Alaska, July 2, 2002).  This Petition for Habeas

1

Corpus pursuant to 28 U.S.C. § 2254 followed.

In this habeas petition, Earl argues that his constitutional rights were violated during trial. Earl's original habeas petition had six specific grounds. He dropped three voluntarily and part of his fourth ground was dismissed. His remaining grounds for habeas corpus are as follows: 1) Earl contends that the trial court's denial of his motion for a mistrial, based upon the positioning of security guards during the testimony of in-custody witnesses, violated his right to a fair trial; 2) Earl argues that the state court's failure to suppress his statements made to police was constitutional error because the statements were given pursuant to an interrogation conducted in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) or the statements were involuntary and therefore inadmissable under the Fifth Amendment; and 3) Earl argues that his consent to providing blood and urine samples was involuntary and the seizure of those samples therefore violated the Fourth Amendment. The Alaska Court of Appeals considered these claims and rejected each of them, upholding Earl's conviction. <u>Earl II</u>, 2002 WL 531097, at *2-*10. Earl urges this Court to find that the state appellate court was wrong in rejecting his constitutional challenges and that the state court's determinations of his constitutional claims were unreasonable applications of clearly established federal law or were based on unreasonable determinations of the facts in light of the evidence presented.

The state opposes the petition. It addresses the merits of Earl's first two issues–that the placement of guards during trial and the admission at trial of his statements to police violated his constitutional rights. It argues that Earl has not demonstrated that the state court's decisions regarding the placement of guards during trial and suppression of Earl's statements were unreasonable in any manner. However, rather than address the merits of the third issue, the state

moves to dismiss it. The state argues that Earl's Fourth Amendment claim regarding the seizure of Earl's blood and urine samples is not cognizable in this habeas proceeding because Earl had an opportunity to fully and fairly litigate that search and seizure claim in state court. See Stone v. Powell, 428 U.S. 465 (1976) (federal district court may not relitigate a Fourth Amendment issue during habeas proceedings when the issue was fully considered in state court).

## II. STATEMENT OF FACTS/PROCEDURAL BACKGROUND

### A. Events on December 31, 1993

At 11:10 p.m. New Year's Eve, December 31, 1993, Earl called 911 to report that he had just arrived at his apartment in Anchorage and that his roommate, Jeffery Ricker, looked like he was dead (Ex. B.1 at 2).[1] Anchorage Police Officer Dahl arrived minutes after the call and entered the house to find Ricker lying on the floor with a pair of scissors implanted in his chest (Ex. C at 13). Officer Dahl noticed blood on Earl's pants and estimated that Earl was intoxicated (Ex. C at 37, 39).

Officer Dahl checked the apartment and then stepped outside with Earl. Earl was wearing a T-shirt and pants (Ex. C at 36). At the direction of Police Sergeant Gardner Cobb, Dahl had Earl wait in Dahl's patrol vehicle because it was cold out (Ex. C at 15, 17, 39-40). Sgt. Cobb ordered Officer Dahl to keep Earl in Dahl's presence until homicide detectives arrived (Ex. C at 81). Dahl turned on his tape recorder once he and Earl were inside the patrol car (Ex. C at 17).

---

[1]All exhibit references in this Report and Recommendation are to the "Exhibits to Petitioner's Brief on the Merits Regarding Petition for Writ of Habeas Corpus 28 U.S.C. § 2254 noted at docket 85 and filed conventionally with the U.S. District Court for the District of Alaska Clerk's Office. There are six exhibits (Exhibits A-F), some with subparts. All page references are to the numbers assigned by petitioner for purposes of his briefing on this petition and not to the various transcript page numbers and bates stamps located on each document.

He advised Earl that the conversation would be recorded (Ex. B.2 at 2). No <u>Miranda</u> warnings were given.

While inside the car, Earl indicated to Officer Dahl that he was cold and that his coat was in his apartment; he also told Officer Dahl that he needed to urinate. Dahl told Earl to "hang on a minute" and then spoke to Cobb about taking Earl someplace to go to the bathroom (Ex. B.2 at 3; Ex. C at 43, 80). The officers decided that Earl could be taken to the police substation to go to the bathroom and wait for investigators (Ex. C at 43). Officer Dahl told Earl that the apartment was a crime scene so he could not go to the bathroom in there but that he could use the bathroom at the police substation. Earl asked if he was under arrest. Dahl told Earl that he was not under arrest, and Earl agreed to go to the substation (Ex. B.2 at 4). Dahl again told Earl that he was not under arrest but that the police needed to talk to people that were at the crime scene to gather as much information as possible (Ex. B.2 at 4).

Dahl transported Earl to the Spenard substation in his patrol car; they arrived at 11:31 p.m. (Ex. B.2 at 6). At the substation, Dahl noticed more blood on Earl and asked him about it. Earl said that he had an argument with Ricker (Ex. B.2 at 7). Earl then went to the bathroom and drank some water. Dahl then told Earl to have a seat (Ex. B.2 at 7-8). Officer Anthony Henry arrived at the substation at 11:35 p.m. (Ex. C at 65). The officers questioned Earl about the events of the night and the source of the blood on Earl's clothing, as well as what caused Earl's injuries (Ex. B.2 at 8-11). Earl discussed his argument with Ricker and told them he then left the house for about 45 minutes, returning to find Ricker dead (Ex. B.2 at 9-10).

Earl told the officers that he needed a coat and asked when he could get going. Dahl said "I don't know" and then reiterated that Earl was not under arrest and that he was free to leave at

4

any time (Ex. B.2 at 15).   He told Earl that he would like him to talk to the investigators (Ex. B.2 at 15).   He explained that the investigators will want to get more details and that he was concerned that if Earl left, he would get more intoxicated or disappear (Ex. B.2 at 15).

Investigator Bill Gifford came to the substation after midnight (Ex. B.2 at 18).   The officers told Earl that he was not under arrest but that the officers were just trying to figure out what happened.   Earl stated "Yeah that's okay" (Ex. B.3 at 2).   Earl stated that he did not know what happened to Ricker (Ex. B.3 at 2).   The officers again questioned Earl about the events of that night and his living arrangement (Ex. B.3 at 2-14).   Earl then consented to a search of his apartment (Ex. B.2 at 14-15, 19-20).

The officers asked Earl if he would go down to the main police station to talk to more investigators, again telling him that he was not under arrest (Ex. B.3 at 15).   Earl stated that he wanted to go home (Ex. B.3 at 16).   The officers hold him that they could give him a ride any place he wanted to go (Ex. B.3 at 16).   Earl indicated that he had no place to go (Ex. B.3 at 16).   The officers reiterated the need for investigators working on the case to talk to Earl but told him he was not under arrest (Ex. B.3 at 16-17).   He then said he didn't want to help the investigators out (Ex. B.3 at 17).   The officers then told him that was fine and was his choice (Ex. B.3 at 17).   They then told Earl that if he were to talk to investigators, they could probably help Earl get a place to stay.   Earl then mentioned that he did not have a coat and that the situation was "uncool."

Earl was then told that Jamie, a woman who lived with Earl and Ricker, was very upset, and that she was being transported to the main police sation (Ex. B.3 at 27).   The police told Earl that Jamie needed his support and asked that he go to the main station to meet with Jamie (Ex.

B.3 at 27). Earl agreed to go.

In total, Earl remained at the substation for about an hour (Ex. B.3 at 28). During Earl's time at the substation, he was accompanied by officers at all times to urinate and smoke outside (Ex. C at 133-36, 140-41). He asked for a jacket a couple of times and the officers told him they would get him a jacket (Ex. B.2 at 13, 18; Ex. B.3 at 28). As the record indicates, he was also told five times that he was not under arrest and was free to leave.

Earl then arrived at the main police station. He was taken to an interview room and did not meet with Jamie. Earl was questioned over the next several hours by Detectives Grimes, Potter, Gifford, and others (Ex. B.8). Before questioning began, Detective Grimes told Earl that he was not under arrest or being charged with anything (Ex. B.8 at 2-3). Grimes again told Earl that no matter what Earl told them, he would be free to go afterward and that they were just conducting an investigation (Ex. B.8 at 3).

Also at the beginning of the questioning, Earl again asked for a coat (Ex. B.8 at 1), and Detective Potter told Earl that it would probably be awhile before they could get his coat (Ex. B.8 at 1). Detective Potter noted to Earl that it looked like he was in pain and wanted to know if Earl was injured. Earl responded that his legs always hurt (he later clarified that he has knee problems and usually wore a brace) and stated that he was hungry (Ex. B.8 at 3). The detectives then began asking Earl questions about his living situation and Ricker.

Later during the interview, Detective Grimes asked Earl about the blood on his pants and after Earl said it was his own blood from the cut on his hand, Grimes told Earl that they would have to take the pants for testing to see who's blood it was. Detective Grimes then asked about the blood on his boots and urged Earl to tell him the whole story (Ex. B.8 at 26-27). Earl then

changed his story and admitted that he "didn't kill [Ricker] on purpose" (Ex. B.8 at 28). He explained that when he returned to the apartment, Ricker had locked him out and so Earl kicked in the door (Ex. B.8 at 28). Earl said that Ricker attacked him with a knife and that Earl responded by hitting Ricker, taking the knife away, and stabbing Ricker (Ex. B.8 at 28-29). Earl admitted to kicking and stomping Ricker but denied stabbing Ricker with scissors or covering Ricker's face (Ex. B.8 at 30-35).

After Earl explained what had happened and throughout the remainder of the interview, Earl kept talking about how he did not want to go to jail and how he was in trouble (Ex. B.8 at 44, 49, 55, 65). The detectives told him that he would not go to jail that night and that they had to finish their investigation first (Ex. B.8 at 45, 55, 65). They told him that he was not under arrest (Ex. B.8 at 55) and that they would give him a ride to wherever he wanted to go (Ex. B.8 at 49). They asked if he had friends he could stay with while they finished the investigation at the crime scene (Ex. B.8 at 59). He never named a place where he wanted to go.

The detectives told Earl that they needed to take blood and urine samples from him and wanted his permission to do so (Ex. B.8 at 56). Earl refused initially (Ex. B.8 at 56). Detective Grimes then told Earl that the sample would "go to help" Earl, since Earl had been under the influence (Ex. B.8 at 56). Earl agreed to provide the samples (Ex. B.8 at 56, 86) and after more questioning and discussion, he eventually signed the consent form (Ex. B.8 at 144). Earl was transported to the hospital for the blood and urine samples by Detectives Grimes and Potter around 5:00 a.m. (Ex. B.8 at 143-44; Ex. C at 181).

The detectives tried to find a place to take Earl and eventually brought him to a restaurant at around 6:00 a.m. and gave him some money for breakfast (Ex. C at 182-83). Earl was arrested

at approximately 3:30 that afternoon (Ex. C at 208).  Earl was not advised of his <u>Miranda</u> rights at the time of his arrest.  Grimes testified that "custody attached at that time" and that there was not going to be further interrogations and so no <u>Miranda</u> warnings were given (Ex. C at 208).

**B.  State Court Proceedings**

Earl was convicted of first-degree murder in Alaska Superior Court on October 31, 1995 and was sentenced to 99 years' imprisonment.  <u>See</u> <u>Earl I</u>, 1997 WL 661175, at *2-4.  Earl appealed, arguing among other things that his statements to the police and his blood and urine samples should have been suppressed.  <u>See</u> <u>Earl I</u>, 1997 WL 661175, *1.  The Alaska Court of Appeals rejected Earl's claim that his statements and blood and urine samples should have been suppressed but reversed Earl's conviction due to the erroneous admission of evidence of his 1991 assault conviction.  <u>Id.</u> at *3-6.  Earl filed a petition for hearing with the Alaska Supreme Court regarding the suppression ruling.  The Alaska Supreme Court denied his request.  <u>See</u> <u>Earl v. State</u>, No. S-8363 (Alaska, March 9, 1998).

After his conviction was vacated, Earl's case returned to the state trial court.  Earl moved again to suppress his statements to police and suppress the use of his blood and urine samples (Ex. A.2).  His motions were denied on the grounds that the Court of Appeals (in <u>Earl I</u>)  had already decided the issue (Ex. D at 5-7).

Earl was retried in 1999.  At the retrial, defense had three in-custody witnesses testify on Earl's behalf.  The first witness was David Lewis.  He was brought to the witness stand while the jury was out of the courtroom.  Outside the presence of the jury, the trial judge told Mr. Lewis that he did not want the jury to know he was in custody so he should not make quick movements that would cause the guard to be nervous (Ex. E at 604).  The judge told Mr. Lewis that when he

was finished testifying the judge would have the jury leave the courtroom.  He instructed

Mr. Lewis to remain seated until the jurors left and then he would be escorted out (Ex. E at 604).

Earl's attorney objected to the fact that there was a uniformed guard sitting near Mr. Lewis by the

jury door because it would present a danger that the jury would know Mr. Lewis was in custody

(Ex. E at 605).  He recognized the need to have security for the in-custody witnesses, but he

suggested that the guard sit on the other side of the door (Ex. E at 605).  The judge stated that he

did not supervise the guards and would defer to what they wanted to do (Ex. E at 605).  The

guard remained positioned inside the courtroom by the jury door during Mr. Lewis's testimony.

When Mr. Lewis finished testifying, the trial judge immediately told the jury he had a 9:30

emergency call to make and excused the jury (Ex. E at 626).  The jury was quickly recalled after

Mr. Lewis left the courtroom and the judge explained that he could not reach the people he had to

call and so they would hear another witness (Ex. E at 626).

Earl's next witness, Mr. Ron Pollack, was not in custody and no guard was positioned by

the jury door (Ex. E at 1002-1003).  After Mr. Pollack's testimony, the judge then sent the jury

out of the courtroom for a small break.  (Ex. E at 631).

The defense's next witness, Mr. Reape, was in custody.  He was brought into the

courtroom outside of the presence of the jury (Ex. E at 631).  The jury was then brought in and

while he testified, a guard stood near the witness and jury door during his testimony (Ex. E at

1002).  The judge then had the jury leave before removing Mr. Reape from the courtroom, stating

"[l]et's take about a 15-minute break here, folks, okay?  You can just remain seated Mr. Reape"

(Ex. E at 658).

After the recess Donald Hudson and John Smith testified on behalf of the defense (Ex. E

9

at 659, 696).  They were not in custody.  No guard was positioned near the witness during their testimony (Ex. E at 1002-1003).  After Mr. Smith's testimony, the judge told the court he needed to check on something and needed to excuse them for a minute (Ex. E at 770).

After the jury left the room, Earl took the stand to testify (Ex. E at 770).  A guard was positioned near Earl by the jury door during his testimony (Ex. E 1002-1003).

Earl's attorney requested a mistrial based on this guard placement.  He indicated that when the other witnesses who were not in custody testified there were four uniformed guards—one by each of the two exits, one by the defense table, and one by the prosecution table—but that when witnesses who were in custody testified, there was a fifth uniformed guard by the jury door.  He argued that this placement signified to the jury that the witnesses were in custody (Ex. E at 1003).  The trial court offered to give an instruction to the jury about the court's standard court security and about not inferring anything particular about court security, but Earl's attorney declined the instruction.  The trial judge then denied the motion for a mistrial (Ex. E at 1004-1005).

Earl was convicted and sentenced to 85 years' imprisonment.  He appealed again on the suppression issues and on new grounds, and the Alaska Court of Appeals affirmed his conviction.  See Earl II, 2002 WL 531097, at *2-10.  He again filed a petition for hearing, which the Alaska Supreme Court denied.  See Earl v. State, N. S-10585 (Alaska, July 2, 2002).

**C.  Habeas Proceedings**

As described *supra,* Earl's petition asserted six grounds for the granting of his habeas petition: 1) he was coerced into giving blood and urine samples; 2) his statements to the police were given in violation of Miranda or were given involuntarily; 3) the state trial court did not

allow him to send the murder knife out of state for testing; 4) he was entitled to a mistrial because judicial service officers changed their placement in the courtroom when defense witnesses incarcerated at the time of trial testified and because the cross examination of witness Cyrus Reape deliberately elicited the information that Reape and Earl had "lived together" in the "same facility"; 5) he was not allowed to impeach a prosecution witness with evidence that she had allegedly been assaulted by Ricker; and 6) his sentence was excessive.  At docket number 12 he dropped the third, fifth, and sixth grounds.

The state conceded that grounds one and two and part of ground four were exhausted (Doc. 19).  However, the state argued that the second part of ground four—the claim that a mistrial was warranted because the state deliberately elicited the information that Reape and Earl had been in jail together—was not exhausted.  The District Court agreed with the respondent and stayed the federal petition while Earl exhausted his claim in state court (Doc. 28).  Earl eventually exhausted the claim related to Reape's testimony (Doc. 47); however, the District Court found that Earl had procedurally defaulted on this portion of his habeas petition and ordered Earl to show cause and prejudice to justify the court's consideration of this portion of the petition (Doc. 47).  Earl filed a response (Doc. 53).  The District Court determined that Earl failed to show cause and prejudice regarding the procedural default and so dismissed the claim related to Reape's testimony (Doc. 53).  The court then ordered briefing on the merits of the remaining issues (Doc. 62).

### III.  STANDARD OF REVIEW FOR HABEAS CORPUS RELIEF

Because Earl filed his petition after April 24, 1996, the petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996)

(hereinafter AEDPA).  See Lindh v. Murphy, 521 U.S. 320 (1997).

Post-AEDPA, a federal court is limited in its ability to grant a writ of habeas corpus on behalf of a person convicted in state court with respect to any claim that was adjudicated on the merits in state court proceedings.  Those limitation are codified in 28 U.S.C. § 2254(d).

## A.  Was the State Court Decision Contrary to or an Unreasonable Application of Federal Law?

Under § 2254(d)(1), the court can grant the writ if the adjudication of the claim resulted in a decision that was *contrary to*, or involved an *unreasonable application of* clearly established federal law, as determined by the Supreme Court.  Clearly established federal law refers to holding, not dicta, of the Supreme Court's decisions that were in effect at the time of the relevant state court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  A state court decision is *contrary to* clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court precedent on a question of law, meaning it applies a rule that contradicts the governing law set forth in a Supreme Court case.  Id. at 405.  A state court decision is also *contrary to* clearly established federal law if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but arrives at a different result then the Supreme Court did.  Id. at 406.  A state court decision is an *unreasonable application* of clearly established federal law if the state court identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.  Id. at 408.  The issue is not whether the state court decision applied federal law incorrectly or erroneously but whether is was applied unreasonably.  Id. at 410-11.  The inquiry into whether or not the state court decision involved an unreasonable application of clearly established federal law needs to look at whether the

12

application was objectively unreasonable.  Id. at 409.

## B.  Was the State Court Decision Based on an Unreasonable Factual Determination?

Under § 2254(d)(2), the court can grant the writ if the adjudication of the claim resulted in a decision that was based on an *unreasonable determination of the facts* in light of the evidence presented in the state court proceeding.  The inquiry under this subsection focuses on the state court's fact-finding determinations and processes.  A state court's factual determinations are also unreasonable if it is not supported by evidence presented in the state court proceeding.  See Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2003).  A state court's factual determinations are also unreasonable if the court failed to make a factual determination that should have been made or if the court made a legal error that infected the fact-finding process and led to the wrong factual determination.  Id. at 1000-01.  A state court's fact-finding processes are unreasonable if the court made an evidentiary finding without holding a hearing and giving petitioner an opportunity to present evidence, or if the court plainly misstated the record in making its fact findings and that misstatement goes to a material issue.  Id. at 1001.  The same standard of reasonableness applies as in 28 U.S.C. § 2254(d)(1), meaning the federal court cannot second-guess a state court's fact-finding process unless, after review of the record, it determines that the state court was not just wrong, but *objectively unreasonable*.  Id. at 999 (citing Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

For each ground remaining in this petition, Earl argued that the state court's determinations were unreasonable applications of clearly established federal law under 28 U.S.C. § 2254(d)(1) and were unreasonable determinations of facts in light of the evidence under 28 U.S.C. § 2254(d)(2).

13

# IV.  ANALYSIS

## A.  Positioning of Security Guards during Testimonies of Incarcerated Witnesses

### 1.  Issue Presented

Earl argued in his brief on the merits that the state court's denial of the defense motion for a mistrial was an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

He further argued that the trial court made an unreasonable determination of the facts in light of the evidence presented when it deferred its decision-making on the issue of courtroom security to non-judicial officers, risking his right to a fair trial.  Earl argued the appellate court also made an unreasonable determination of the facts when its review presumed facts not established; namely, that the specific position of the security officers was necessary during the testimonies of incarcerated witnesses.

### 2.  State Court Determination

As stated previously, the trial court denied Earl's motion for mistrial based on the placement of security officers.  The judge discussed the various inferences juries can draw and stated that the court does its best to make sure that it does not appear as if someone is in custody. He then offered to give the jury an instruction about the necessity of general court security and the importance of not drawing any inferences based on the security arrangements in the courtroom, but he denied the motion for mistrial (Ex. E at 1005).

Earl raised the issue on appeal.  The appellate court stated that defendants and witnesses should not be treated in a manner that would identify them "as someone in custody to the jury, thus undermining the presumption of innocence and prejudicially affecting the defendant's right

14

to jury trial." Earl II, 2002 WL 531097, at *6 (quoting Hines v. State, 703 P.2d 1175,1176 (Alaska App. 1985)).  The court stated that when it reviews a claim of prejudice based on the treatment of defendants or witnesses, the court has to make "a practical assessment of whether a defendant's treatment in the individual case would reasonably have led a jury to conclude that he was being held in custody, subjected to restraints or kept under a level of supervision indicating a belief on the part of the court in the defendant's guilt."  Id.  It went on to note that "any restraint that clearly, continuously, and unequivocally conveys the impression that the defendant or witness is dangerous or a criminal must be justified by exceptional circumstances."  The court then found that the record did not indicate that the placement of the guards was prejudicial.  It stated that Earl and two of his witnesses were in custody and it was "necessary to have security while they testified."  Id.  The court ultimately concluded that the trial court did not err in determining that Earl was not unfairly prejudiced by the guard's placement.  Id.

### 3.  Applicable Federal Law

The right to a fair trial is a fundamental liberty insured by the Fourteenth Amendment. Drope v. Missouri, 420 U.S. 162 (1975).  A defendant's presumption of innocence is a basic component of the right to a fair trial.  Estelle v. Williams, 425 U.S. 501, 503 (1976).  Therefore, courts must carefully guard against dilution of principle that guilt is to be established by probative evidence and beyond a reasonable doubt and not by grounds of official suspicion, continued custody, or other circumstances that do not amount to proof.  Id.; Taylor v. Kentucky, 436 U.S. 478, 485 (1978).  When reviewing a court practice to determine if the practice improperly highlights a defendant's continued custody or creates an inference of official suspicion, courts must use reason, principle, and common experience to determine the potential

15

effects of the practice. <u>Williams</u>, 425 U.S. at 504. However, not "every single practice tending to single out the accused from everyone else in the courtroom" needs to be struck down as improper. <u>Holbrook v. Flynn</u>, 475 U.S. 560, 567 (1986).

In <u>Williams</u>, the Supreme Court determined that requiring a defendant to attend trial in prison attire against his will is a continuing influence at trial that presents an unacceptable risk that impermissible factors about guilt or innocence will come into play. 475 U.S. at 512-13. When the defendant is forced to wear prison clothes, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." <u>Id.</u> at 404-05. The Court noted that there is no essential state policy served by compelling a defendant to dress in prison clothes. <u>Id.</u> at 405. It therefore held the state cannot compel an accused to stand trial before a jury while dressed in identifiable prison attire. <u>Id.</u> at 405-06, 412-13. However, the Court held that because the defendant failed to object to being tried in such prison attire, he did not show that there was compulsion on the part of the state. <u>Id.</u> at 412-413.

In <u>Illinois v. Allen</u>, 397 U.S. 337 (1970), the Court recognized that shackling and gagging would have a significant effect on the jury's feelings about the defendant. <u>Id.</u> at 340. However, the court noted that shackling and gagging a defendant is appropriate if a defendant is disruptive and obstreperous. <u>Id.</u>

In <u>Flynn</u>, the Court considered whether the noticeable positioning of "security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest." 475 U.S. at 568. The Court held that having uniformed security in a courtroom during trial is not inherently prejudicial like shackling is and therefore does not need to be justified by an essential state interest specific to

16

each trial. Id. at 568-69. The Court stated that there was a difference between the use of identifiable security officers in courtrooms and those courtroom practices that are inherently prejudicial. The difference is that there is a wide range of inferences that a juror could reasonable draw from officers' presence and their presence is not an inherent sign that the defendant is particularly dangerous or culpable. Id. at 569. After determining that the mere presence of the uniformed guards is acceptable, the Court recognized that there are many ways in which those guards can be deployed and therefore it has to look at each case to determine if the way the guards are deployed is inherently prejudicial. Id. A certain deployment of guards is inherently prejudicial if "an unacceptable risk is presented of impermissible factors coming into play." Id. at 570.

In Flynn, a defendant was being tried with five other co-defendants and the customary security force was supplemented by four uniformed state troopers sitting in the front row of the spectator section behind the defendants. Id. at 562-63. Applying its case-by-case approach, the Court found that having the uniformed officers sit quietly in the front row throughout the trial was not posing an unacceptable risk of prejudice and did not tend to brand the defendant "with an unmistakable mark of guilt." Id. at 571 (quoting Williams, 425 U.S. at 518 (Brennan, J., dissenting)).

The Court noted that even if there was some prejudice involved, there was sufficient cause for having that level of security because the defendants were denied bail after determinations that their presence at trial could not otherwise be ensured and were in state custody. Because the deployment of state troopers was related to a legitimate interest in maintaining custody during the proceeding, it did not violate the Equal Protection Clause by

discriminating against those without bail.  Id. at 571-72.  Because the scene presented to the jury was not inherently prejudicial and because the defendant did not show that there was any actual prejudice resulting from the placement of the state troopers, the Court found that the defendant's constitutional rights were not violated.  Id. at 572.

### 4.  Conclusion

#### a)  Guard Placement was not Inherently Prejudicial

In this situation, Earl does not object to the mere presence of uniformed guards in the courtroom.  He concedes that the presence of the uniformed guards is not inherently prejudicial under clearly established federal law set forth in Flynn.  He argues instead that the deployment of the uniformed guard next to the jury door only when witnesses who were in custody testified was inherently prejudicial.  Earl claims this inconsistent positioning and this positioning near the jury door branded the defendant and his witnesses with an unmistakable mark of guilt and dangerousness.  Therefore, according to Earl, this specific positioning was inherently prejudicial and the state court's determination was an unreasonable application of clearly established federal law.

The record in this case does not lead this Court to find that the placement of the guard by the jury door during the testimony of incarcerated witnesses was inherently prejudicial.  The record indicates that the trial judge considered the incarcerated status of the defense witnesses and took steps to make sure that this status was not highlighted in front of the jury.  He made efforts to excuse the jury at any time when an incarcerated witness was going to enter or leave the witness box, escorted closely by a guard.  This allowed the guard to be in place before the jury came into the courtroom.  The record indicates that the actual movement and placement of the

18

guard was done outside the presence of the jury. This Court does not find that a guard standing by the jury door during the testimony of a select few witnesses creates an unacceptable risk of the jury drawing improper inferences about the defendant's guilt. This situation did not create a clear inference that those witnesses were dangerous or place an unmistakable badge of guilt on the defendant. It was not a constant reminder of the accused's custodial condition like shackling a defendant or requiring the defendant wear prison attire.

Finally, the record does not show that any of the jurors were actually influenced by this guard placement. As the trial court noted, Earl even admitted during trial that he was in jail. (Ex. E at 1005). Therefore, this Court does not find that the placement of the guards during trial violated his right to a fair trial. Furthermore, the trial judge offered to give a specific jury instruction to make sure no improper inferences would be drawn because of court security placement and Earl's counsel declined.

**b) The Decision was not Contrary to Established Federal Law**

Even if this Court were to find that the state court was wrong in its determination, Earl is not entitled to habeas relief unless the decision was *contrary to*, or involved an *unreasonable application of*, clearly established federal law, or if the decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d). See Section III *supra*.

The state court's decision was not contrary to federal law. In Earl II, the state appellate court applied the appropriate legal rule and did not confront a set of facts indistinguishable from a Supreme Court decision and then arrive at a different result as the Court. See Section III *supra*.

19

While it did not cite to federal law,[2] it recognized the same standard set forth in Williams and applied the appropriate case-by-case analysis to determine if the practice was unfairly prejudicial. It found that the practice was not prejudicial to Earl.  Earl II, 2002 WL 531097, at *6.

Indeed, Earl does not claim that the state court decision was contrary to clearly established federal law of the Supreme Court.  Instead, he argues that its decision was an unreasonable application of Williams and Flynn.

### c)  The Decision was not an Unreasonable Application of Federal Law

The Supreme Court has noted that the range of reasonable state court judgment depends on how general the relevant rule is.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  The Court stated that:

> [A]pplying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Id.  In this situation, the rule set forth in Flynn regarding the placement of security guards is a case-by-case analysis to determine if the specific deployment of uniformed guards is inherently prejudicial.  Because this is a general test, the state court is granted leeway in its judgment. Therefore, this Court does not find that the state court decision was objectively unreasonable and habeas relief is not warranted under 28 U.S.C. § 2254(d)(1).

---

[2] In Early v. Packer, 537 U.S. 3 (2002), the Court noted that a state court decision is not contrary to federal law if it does not specifically cite to federal law.  The state court must simply apply reasoning that is not contradictory to the federal law.  Id. at 8.

### d)  The Decision was not an Unreasonable Factual Determination

Earl also claims that the state court's determination was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Earl states the trial court improperly deferred judgment about where the guards should stand to the guards themselves without making any finding regarding the security risk and necessity of having a guard stand near the jury door.  Earl claims that the state trial court therefore failed to make a factual determination that should have been made.

The precedent set forth in <u>Flynn</u> does not require courts to make a finding of necessity before deploying uniformed guards in the courtroom.  There must be an essential state interest only if the practice is inherently prejudicial.  While the state court in <u>Flynn</u> had held a hearing on the matter to determine if extra security was necessary, the trial judge ultimately determined that a state has a general interest in maintaining control over people in its custody, and that general interest is sufficient to justify the extra security.  The judge did not find any specific threat to safety or possibility of escape was at play.  Therefore, this Court finds that the state court in this matter did not fail to make a required finding.

Furthermore, this Court does not find the trial judge's fact-finding process regarding this issue to be unreasonably flawed.  In this case, it was reasonable for the judge to determine that the guards would place themselves as required to maintain adequate control over those in state custody.  The judge demonstrated careful efforts to protect the defendant and his witnesses from any improper inferences due to their custodial status.  He took steps he thought were necessary to make sure that the courtroom procedure was conducted in such a way to avoid highlighting the witnesses' incarceration.  The record supports the conclusion that the judge considered the issue

in a reasonable manner and made reasonable factual determinations.

Earl also argues that the state appellate court made a factual determination not supported by the evidence by presuming that the security was necessary while the incarcerated witnesses testified even though the trial court never made such a finding of necessity.  The appellate court clearly determined that the guard positioning was not unfairly prejudicial based on the record before them.  Earl II, 2002 WL 531097, at *6.  The appellate court stated that some level of security for witnesses in state custody is necessary.  This Court finds that it was not unreasonable for the appellate court to conclude this without identifying a case-specific finding of necessity in the record.  As noted above, the Supreme Court in Flynn recognized a state's general interest in securing people that are in its custody and did not require that a case-specific finding be made.  Furthermore, the appellate court's decision did not rest solely on the state's interest.  The court did not find that the practice was slightly prejudicial but that the necessity of security justified the infraction.  Rather, the court clearly concluded that the guard's placement was not unfairly prejudicial.  Earl II, 2002 WL 531097, at *6.

Therefore, this Court does not find that the state court's fact-finding was objectively unreasonable and habeas relief is not warranted under 28 U.S.C. § 2254(d)(2).

## B.  Earl's Statements to the Police

### 1.  Issue Presented

Earl argued that his statements to the police, and the fruits of those statements, ought to have been suppressed at his trial because he did not receive the warning mandated by the Supreme Court's holding in Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Earl argued, in the alternative, that his statements were inadmissible in court because they were involuntarily made.

He argued that the state court's decision was an unreasonable application of clearly established federal law and that the state court's decision was unreasonable in light of the evidence presented and therefore habeas corpus relief is warranted under 28 U.S.C. § 2254(d)(1) and (d)(2).

**2. Summary of State Court Determination**

The state court found that Earl's statements to the police on December 31, 1993 had been offered voluntarily and that Earl was not in Miranda custody. All statements made by Earl to the police were therefore deemed evidence that could be used against Earl at trial.

The state court judge held in part:

> [T]here are certainly factors that we could look at that would lead us to conclude, as the defendant had, that they're consistent with the defendant's argument: The length of the interview, the place of the interview, the lack of a coat, the fact that at page 143 of the transcript he was told to sit down. There are a lot of things we can look at and say, well, those factors are consistent with the defendant's argument. But if we look at the totality of the circumstances, I think we have to conclude that the defendant was not placed in custody formally. He was constantly assured that he was not under arrest, that there was no de facto custody here, that there wasn't a functional equivalent of custody, that there wasn't a psychological equivalent of custody. I don't believe that a reasonable person would have felt they were in custody or not free to leave. I don't believe that the defendant himself thought he was in custody on this occasion ... I believe it was a non-custodial interview. The statements were voluntary, not coerced. His will was not

23

overborne, and his consents to the search and seizures were likewise

voluntary. The motion should be and hereby is denied in its entirety.

(Ex. C at 161-162).

The Alaska Court of Appeals affirmed the trial court's conclusion <u>Miranda</u> warnings

were not required because Earl made his statements voluntarily during a noncustodial

interrogation. The court considered the length of the interview. It considered the fact that Earl

was not physically restrained. It considered the cordial tone of the interview but recognized that

there were a few places where the detectives were confrontational. It stressed that the detectives

remained calm and non-hostile. It considered the fact that Earl was told he was not under arrest

many times and was told that he would be released at the end of the questioning. It concluded

that the constant assurances by the police support the trial judge's finding that a reasonable

person in Earl's position would have understood that he was free to leave. The court stated,

"[w]e have reviewed the interrogation and we conclude that Judge Rowland's ruling is supported

by the record." <u>Earl I</u>, 1997 WL 661175, at *4.

After the appellate court reversed and remanded the case for retrial on other grounds, Earl

brought another motion to suppress the statements based on the same grounds (Ex. A.2). His

motions were denied on the grounds that the Court of Appeals (in <u>Earl I</u>) had already decided the

issue. (Ex. D at 5-7). In <u>Earl II</u>, the appellate court stated that on retrial the trial judge did not err

in refusing to consider the admissibility of Earl's statements again and that the issue was clearly

decided in <u>Earl I</u>. <u>Earl II</u>, 2002 WL 531097, at *3.

**3. Applicable Federal Law Related to Custodial Interrogation Question**

In <u>Miranda</u>, the Supreme Court held that pre-interrogation warnings must be given in the

24

context of custodial interrogations because of the "compulsion inherent in custodial surroundings." 384 U.S. 436 at 458.

Under Supreme Court precedent, the determination of whether or not a suspect is in custody is a two-part test. First, a court must look at the circumstances surrounding the interrogation. Second, the court must consider those circumstances and determine if a reasonable person would have felt free to leave. Thompson v. Keohane, 516 U.S. 99, 112 (1995). This is an objective and not subjective test; the court looks at the objective circumstances of the interrogation and not on the subjective views harbored by the interrogating officers or the person being questioned. Stansbury v. California, 511 U.S. 318, 323 (1994). Whether or not an officer intends to arrest a suspect has no bearing on the question of Miranda custody. Berkemer v. McCarty, 468 U.S. 420 (1984). The objective test resolves the ultimate inquiry of whether or not there was a formal arrest or restraint on freedom of movement to the degree associated with formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983); Thompson, 516 U.S. at 112.

In Oregon v. Mathiason, 429 U.S. 492 (1977) the Supreme Court held that when a suspect had come voluntarily to a police station, was informed that he was not under arrest, and was allowed to leave at the end of the interview, the questioning was non-custodial. Similarly, in Beheler, the Court held that although a suspect was questioned close to the time of the crime's occurrence and the suspect was a parolee who had been drinking and was upset, the suspect was not in custody. Beheler, 463 U.S. at 1125-26.

**4. Conclusion Regarding Custodial Interrogation Question**

    **a) Determination Defendant was not in Custody was not Contrary to or an Unreasonable Application of Established Federal Law**

In order to grant habeas relief, this Court has to determine that one of the criteria set forth in § 2254(d) has been met.  See Section III *supra*.  The Supreme Court has noted that the more general the applicable federal rule, the more leeway courts have in reaching outcomes in case-by-case determinations.  Alvarado, 541 U.S. at 665.  In Alvarado, the Court looked at whether a state court's determination that the defendant was not in custody for purposes of Miranda and decided that the state court's decision was a reasonable application of federal law.  Id.  The Court recognized that there were factors weighing against a finding that Alvarado was in custody, including the fact that the defendant went home after the interview, and the fact that the police did not threaten the defendant with arrest or authority but simply appealed to his interest in telling the truth and being helpful.  Id.  The Court also recognized that there were factors weighing in favor of a finding that Alvarado was in custody, including the long time of the interview, and the fact that the police did not tell Alvarado he was free to leave.  The Court concluded that "fairminded jurists" could disagree over whether or not Alvarado was in custody and therefore held that the state court's application was reasonable. Id. at 664-65.  Because the nature of the applicable federal rule was general, the Court noted that the state court's determination of the issue fit within the "matrix of our prior decisions."  Id. at 665.

Likewise, in this case, the state court's determination that Earl was not in custody for the purposes of Miranda is supported by the record.  Earl went voluntarily to the police station, he was repeatedly told that he was not under arrest, and he was allowed to leave at the end of the

interview.  While there are factors weighing in favor of a finding that he was in custody, such as the length of the interview and the fact that Earl was cold and was not provided a coat, this Court finds that fairminded jurists could disagree over whether or not Earl was in custody.  Because the standard is general, the state court's judgment is granted more leeway.  The situation is similar to Mathiason because Earl was told that he was not under arrest and was free to leave and he was released at the end of the interview.  Therefore, the state court's decision fits within the matrix of the Supreme Court's prior decisions and is reasonable.  Habeas corpus relief is not warranted under § 2254(d)(1).

### b) The Decisions Were Not Unreasonable Factual Determinations

Earl also claims that the state court's fact-finding process and determination was unreasonable in light of the evidence presented to the trial court.  He claims the trial court did not look at all the factors and just summarily concluded that there was no custody.  This Court does not find Earl's argument persuasive.  The record shows that the trial court listed out factors for and against a finding of custody.  The appellate court also listed the factors for and against a finding of custody.  It is clear that the trial court and the appellate court were familiar with the record and the circumstances surrounding Earl's interrogation.

In Earl's merit brief where he discusses the appellate court's decision on this issue, Earl argues that the appellate court erred when it failed to address the trial judge's statements before he ruled on the motion to suppress.  After hearing the evidence and before applying the applicable test, the trial judge questioned why officers do not give Miranda warnings even if not required.  He stated that he didn't know why Miranda warnings were not freely given and that some of these suppression hearings could be avoided if they were routinely given even if not

required. He then stated that the rules of the playing field do not apply and should not apply in cases where someone is stabbed to death (Ex. C at 160).[3]  The judge also speculated as to why someone would give such a disastrous confession.  He noted that some people may think it must have been coerced out of him but stated that there could be other reasons someone would give such a confession, such as to rationalize and minimize his conduct to the officers and himself.

Despite his earlier comments about the inapplicability of the rules of the playing field in a case involving a stabbing, the trial court then went on to apply the appropriate test, looking at the circumstances and determining whether or not a reasonable person would have felt as if they were not free to leave.

Earl does not flesh out his argument as to what he believes the trial judge was saying and how this statement particularly justifies habeas relief.[4]  It is unnecessary to resolve, because this Court finds that the trial judge applied the proper standard for determining custodial interrogation in this case, looking at the totality of the circumstances to determine if a reasonable person would have felt free to leave or not.  This Court finds no basis to conclude that the court's fact-finding process was unreasonable in light of the evidence in the case.

---

[3] The judge stated, "[w]hy don't we give- why don't officers give the Miranda warnings even when they're not required to do so.  I don't know why ...[t]he question is whether they were required.  And it does- I think it- it's well for all of us to remember that the rules of the playing field do not apply and should not apply in cases where someone is stabbed to death." (Ex. C at 160).

[4] Earl appears to suggest that the judge's comments implied bias or use of an improper standard.  When reviewed in context, the trial judge could also be referring to police practices and discussing why the police might not have gone above and beyond requirements and given Miranda warnings suggesting that extra steps an officer might take above and beyond requirements of the law, might be foregone when a stabbing is involved.  It is unnecessary for this Court to resolve this issue because the trial judge applied the appropriate standard for determining custodial interrogation.

### 5. Applicable Law Related to Voluntariness of Statement

A defendant's statement must satisfy two criteria to be deemed involuntary. First, it must not have been the product of coercive police activity. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Second, the coercive police activity must have overcome the defendant's will to resist making a statement. Hayes v. Washington, 373 U.S. 503, 513 (1963).

### 6. Conclusion Related to Voluntariness of Statement

The state court found that Earl appeared to be cooperative and while he had been drinking before the interview, he participated in the interview in a coherent and rational manner. It found that there was "no evidence that the police did anything to overbear Earl's will." Earl I, 1997 WL 661175, at *5. Earl argued that this determination failed to consider the totality of the circumstances under which Earl cooperated.

Again, this Court finds that fairminded jurists could disagree over whether or not Earl's statements were voluntary. Earl noted that the length of the interview, the failure to give Earl a coat when requested, and the fact that Earl had no where to go suggest that the situation was coercive and that Earl's will was overborne. However, the state court correctly noted that the record also shows Earl was not threatened, the police remained cordial throughout the interview, and that Earl did not resist talking and appeared cooperative. Because the standard is a general one that depends on the circumstances of each case, the state court's judgment is granted more leeway. Alvarado, 541 U.S. at 665. This Court finds that the state court was reasonable in its application of federal law. Furthermore, there is nothing presented to this Court to suggest that the state court's fact finding process or determination was unreasonable. Therefore, habeas relief under § 2254(d) is not warranted.

**C.  Fourth Amendment Claim: Seizure of Blood and Urine Specimens**

**1.  Issue Presented**

Earl wants this Court to find that habeas relief is warranted under § 2254(d)(1) and

§ 2254(d)(2) because the state court unreasonably determined this Fourth Amendment issue.  The

state responds by asserting that this Court cannot grant habeas relief on this ground unless the

defendant shows that he was denied a full and fair opportunity to litigate that claim in state court.

Mack v. Cupp, 564 F.2d 898, 901 (9th Cir. 1977).

**2.  Summary of State Court Holdings**

Earl argued to the state court that although he gave written consents for the police to take

his blood and urine specimens, his consent was involuntary.  Therefore, he requested the state

court to suppress this evidence.

The state court conducted an evidentiary hearing on Earl's motion to suppress this

evidence. See Ex. C  It concluded that his consent was given voluntarily.  The Court of Appeals

affirmed this ruling in Earl I.  The court recognized that Earl initially refused consent but after

some discussion agreed to allow the police to obtain the samples.  The court noted that the record

indicated that the police showed Earl the consent form and told him that he had a constitutional

right not to have a search made of his blood and urine and that he could refuse the consent.

Therefore, it held that the state court did not err in concluding that Earl had voluntarily

consented.  Earl I, 1997 WL 661175, at *5.

**3.  Conclusion Regarding Habeas Relief Pursuant to Fourth Amendment**

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that a federal district

court may not relitigate a Fourth Amendment search and seizure issue that has been tried fully

and fairly in a state court, regardless of whether it thinks the state court was correct. [5]

Earl only addresses this Fourth Amendment ground on the merits, arguing about the

correctness of the state court's determination.  Under Stone, the correctness of the state court's

determination is irrelevant. It is the full and fair opportunity to litigate the issue that matters.

Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994).  Earl does not address the Stone

precedent nor does he demonstrate how he was denied a full and fair opportunity to litigate this

search and seizure claim in state court.

The record indicates that the state trial court and the state Court of Appeals considered

Earl's Fourth Amendment argument fully.  The state court conducted an evidentiary hearing on

the matter (Ex. C).  Based on the evidence presented at that hearing, the court made a

---

[5]The Stone court stated:

> Evidence obtained by police officers in violation of the Fourth
> Amendment is excluded at trial in the hope that the frequency of
> future violations will decrease.  Despite the absence of supportive
> empirical evidence, we have assumed that the immediate effect of
> exclusion will be to discourage law enforcement officials from
> violating the Fourth Amendment by removing the incentive to
> disregard it.  More importantly, over the long term, this
> demonstration that our society attaches serious consequences to
> violation of constitutional rights is thought to encourage those who
> formulate law enforcement policies, and the officers who
> implement them, to incorporate Fourth Amendment ideals into
> their value system.
>                                    * * *
> We adhere to the view that these considerations support the
> implementation of the exclusionary rule at trial and its enforcement
> on direct appeal of state-court convictions.  But the additional
> contribution, if any, of the consideration of search-and-seizure
> claims of state prisoners on collateral review is small in relation to
> the costs.

Stone v. Powell, 428 U.S. 465, 492-93, 96 S.Ct. 3037 at 3051-52.

determination that his consent was not coerced (Ex. C at 162). Earl has not demonstrated how this procedure was not full and fair and the Court sees no indication of that based on the record.

## V.  CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Earl's petition for writ of habeas corpus on the ground that a mistrial was required due to the placement of security guards during the testimony of incarcerated witnesses and on the ground that Earl's statements to police should have been suppressed be DENIED. This Court recommends that the state's motion to dismiss Earl's Fourth Amendment ground for habeas relief (Doc. 90) be GRANTED.

DATED this 10th day of March, 2008.

/s/ Deborah M. Smith
DEBORAH M. SMITH
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **CLOSE OF BUSINESS, March 14, 2008.**  Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-89 (9th Cir. 1980), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.  United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, March 19, 2008.**  The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant

to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgement.  <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).