Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400
Attorney for Petitioner

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JACK L. EARL, JR., <br><br> Petitioner, <br><br> vs. <br><br> CRAIG  TURNBULL, <br><br> Respondent. | Case No. 3:02-CV-0224-HRH <br><br> **OBJECTIONS TO MAGISTRATE'S INITIAL REPORT AND RECOMMENDATION AT DOCKET 100** |

    Pursuant to the requirements of D. Alaska L.M.R. 6(a) and this court's order at Docket 100, page 32, objections are submitted, and specified as much as space permits.

    I.  COURTROOM PLACEMENT OF OFFICERS (Docket 100 at 8-10, 14-22)

A. Factual Basis

    With respect to this issue, the relevant factual recitation should have included the following:

• Courtroom "guards" and "security guards" are called "JS" and "JS officers," and therefore should best so identified.  This court has also been asked to take judicial notice that the "JS" or Judicial Services Division is a section of the Alaska State Troopers, *see*, e.g., *Turney v. State*, 922 P.2d 283, 284 (Alaska App. 1996).  Its officers are uniformed, *see*, e.g., *Woodard v. State*, 1998 WL 849246 at 42 (Alaska App. 1998);

• Both the presence and positioning of a fifth courtroom JS officer near the jury was <u>not</u> consistent throughout the trial;

• The addition of a JS officer at the jury door occurred only during the defense case;

• The positioning of an additional officer resulted in six[1] changes of guard positions within the courtroom during the trial, making the changes noticeable;

---

[1] In his merit brief, Mr. Earl stated there were five switches, but this was in error.

- The changed officer positioning occurred at the "jury door," a location close to the jury (visibility was the basis of objection and motion);

- Although the defendant had been in the courtroom throughout the state's case-in-chief, a fifth officer was only "required" when the defendant was situated close to the jury, during his testimony;

- The defense timely objected to the addition and positioning of the fifth officer;

- The trial court made no inquiry into the necessity of the fifth officer and his inconsistent position in the courtroom.

B.  Conclusions

Mr. Earl objects to the magistrate's conclusion that the decision denying mistrial was neither contrary to federal law nor an unreasonable application of federal law. Mr. Earl has relied on both prongs of 28 U.S.C. § 2254(d), asserting that the state trial court's denial of the defense objection and motion for a mistrial was not merely incorrect, but was an objectively unreasonable application of federal law. The trial court failed to extend clearly-established legal principles, i.e., the fair trial guarantee and due process, to the arrangement of obvious and selective placement of an additional uniformed officer, even though objection was timely made.

The magistrate judge specifically determined that the placement of an additional officer by the jury door was not inherently prejudicial (pp. 18-19). Objection is made to that conclusion.

- First, the court seems to have erroneously assumed that a courtroom arrangement or practice could only be inherently prejudicial if it was a constant feature throughout the trial (at 19). The recent decision in *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. (February 13) 2008). provides authority for the petitioner's position that a courtroom practice limited to some but not all of a trial proceeding still requires judicial scrutiny if due process is implicated. In this case, it was in fact the selective and inconsistent deployment of a fifth uniformed officer during some testimonies that would have created the prejudice.

- Second, the court concluded that there was no "clear" inference of guilty and therefore no prejudice. Mr. Earl disagrees. as only negative and impermissible inferences can be drawn from the courtroom practice in this case. The jury could only infer that: the three defense witnesses – including the defendant – were in custody; the witnesses' proximity threatened or endangered the jury; and the witnesses were not to be trusted so close to the jury and the jury door. This deployment was especially obvious because it occurred close to the jury, and, up until that point in the trial, the safety of all present had been apparently adequately secured with four officers. Such arrangement "branded" the defendant in particular "with an unmistakable mark of guilt," and discriminated against one who had not been able to post bail. *See Estelle v Williams*, 425 U.S. 201, 505, 96 S. Ct. 1691 (1976).

- Third, the magistrate's report mentions that the trial court did exercise some discretion in excusing the jury during the movement of incarcerated witnesses (at 18). The implication here is that the court considered the issue, and arrangements could have been more damaging. The bottom line here, however, is that the trial court never did inquire as to the necessity of shifting courtroom

arrangements, and the lack of error in other respects does not excuse the due process violation that did occur.

- Finally, the magistrate also considered the lack of any indication in the record that the jurors were actually influenced by the guard placement (at 19). The actual impact of a particular practice on the judgment of jurors cannot always be fully determined, therefore a showing of "actual prejudice" is not required in the instance of an inherently prejudicial courtroom arrangement. *Estelle v Williams*, 425 U.S. 201, 505, 96 S. Ct. 1691 (1976).

Mr. Earl also objects to the magistrate's conclusion that the state court decision was not an unreasonable factual determination (at 21). The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of the facts in light of the evidence" under § 2254(d)(2). *See Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000) (citation omitted).

The trial court made no reasoned determination of the facts in light of the evidence because it delegated all decision-making to nonjudicial officers, and such arrangements risked the violation of Mr. Earl's right to a fair trial. Also, the appellate court made an unreasonable determination when its review presumed facts which were never established, that the visible and selective positioning of officers was 'necessary' during Earl's and others' testimonies because of their incarcerated status. *Earl v. State*, 2002 WL 531097 at 6 (Alaska App. 2002). Where a practice is inherently prejudicial, the failure of the trial court to make a prior determination as to the necessity of the practice should not be remedied on a post hoc review of the record. *See*, e.g., *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. (February 13) 2008), *citing Deck*, 544 U.S. at 634-35.

## II. EARL'S STATEMENTS TO THE POLICE

A. Factual Basis

There are a large number of relevant facts which have not been included in the court's recitation. Without reiterating them all here, Mr. Earl simply refers the magistrate judge to the annotated list at pages 19-23 of Mr. Earl's merit brief and asks that they be incorporated herein.

Mr. Earl does specifically object to the following:

- (Page 3) That Officer Dahl "had Earl wait in Dahl's car because it was cold out." It was cold out, but that was not the motivating reason. Earl was directed outside of his house by the police (Tr. 79, 99-102), and was told he could not reenter. Earl was directed to the car because he could be surveilled and secured there. He was a "possible suspect." Dahl's supervisor ordered Dahl to keep Earl in his presence. (Tr. 106, 144, 146)

- (Page 4) Earl did not agree to go to the nearby substation. He needed desperately to urinate and was told he could go there. (R. 34) Once he used the bathroom at the substation, he was not transported back to his home, but was told he would have to wait there. (Tr. 130, 128)

- (Page 5) Earl's refusal to meet with the homicide investigators was not respected. The officers continued to emphasize how the "need" for Earl to answer their questions.

- (Page 6) Although Earl had agreed to be transported to the main police station for a limited purpose, i.e., to be with and comfort Jamie, his friend, that limited consent was ignored. (R. 69-70) Earl was not brought to Jamie, nor Jamie to him. Earl saw no friend there. Instead, Earl was brought into an interrogation room and confronted by the investigators he had previously declined to meet.

- (Page 19) The undersigned has not found the reference for the assertion that Earl testified during trial that he was in jail (Ex. E at 1005).

B.  Conclusions

1.  *The Defendant Was "In Custody" for Miranda Purposes*.

The magistrate judge has determined that 'fair-minded jurists could differ' as to whether Earl was "in custody" for *Miranda* purposes prior to his making inculpatory statements in response to police interrogation (pp. 26-27). Mr. Earl respectfully disagrees with the identified factual basis, as well as the conclusion for this determination. First, Earl did not go voluntarily to the police station for the purpose of answering questions. He was transported there for the purpose of urinating, but then was not transported back, and he lacked any means, clothing, or possessions with which he could manage on his own. Although Earl was repeatedly told he was not under arrest, he was not told that he could leave at that time: Earl was repeatedly told the officers' first "needed" to talk with him and to finish their investigation. Earl was not told when that would be. When he twice expressly refused to be interviewed at the police main station by homicide investigators, he was brought there anyway for that purpose, under a ruse and contrary to his consent.

This case is not similar to *Mathiason*. In *Oregon v. Mathiason*, 429 U.S. 492, 493, 495 (1977) (*per curiam*), a police officer contacted the suspect after a burglary victim identified him. The suspect later voluntarily appeared at the police station for an interview. Although the police officer stated his belief that the suspect was involved, the officer also stated he was not under arrest. The interview lasted 30 minutes, and the suspect admitted his guilt. He was then allowed to leave. The Court held that the questioning was not custodial because there was "no indication that the questioning took place in a context where [the suspect's] freedom to depart was restricted in any way." *Id.*, at 495. In Earl's case, the freedom to depart was restricted in almost every way. Earl did not voluntarily appear at the police substation to answer questions. He desperately had to urinate and was refused access to his home for that purpose. Following that transport, the police did not return him to the point of contact, his house. He remained isolated in a police facility, without the means to return to his house. No officer retrieved his coat nor offered him clothing. At all times he was in the exclusive company of uniformed armed police officers. He was accompanied by officers outside when he asked to go went outside to smoke. Although he was told he was

not under arrest, he was increasingly incredulous. Earl was told his statements were tape recorded. He was repeatedly told he "needed" to answer questions from the investigators. Although he said he did not want to speak to homicide detectives and did not want to meet them at the police main station, his wishes were ignored and he was brought into an interrogation room. This process lasted hours, with no *Miranda* warnings given.

      2.    *The State Court Decisions Were Unreasonable Factual Determinations* (*at 27-28*)

As previously noted, the trial court's determination includes the statement that the rationale for *Miranda* warnings "do not apply and should not equally to cases where someone is stabbed to death" (Ex. C at 160). Granted, the statement is hardly a model of clarity, but the import seems obvious enough: that the court's manner of adjudging *Miranda* violations has something to do with the significance of the crime involved. Where the trial court analysis reflects such an obvious and fundamental error, it cannot be discounted, ignored, and deemed irrelevant to the result that follows.

      3.    *Earl's Statements Were Involuntarily Made*

To determine if testimonial evidence supplied by a defendant was involuntary, a court must ask whether, in the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963); *Townsend v. Sain*, 372 U.S. 293, 307 (1963); *Culombe v. Connecticut*, 367 U.S. 568, 602, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037(1961). A person's will was overborne if his statement were not the "product of an essentially free and unconstrained choice." *Id.*

Here, the trial court did not consider the totality of circumstances presented, therefore its determinations could not be reasonable. If all of the circumstances had been considered, fair-minded jurists would agree that Mr. Earl's statements were not the produce of "an essentially free and unconstrained choice." *Id.* What the officers might have promised (no arrest), their actions would have informed a reasonable person that the person was not free to leave if he declined to cooperate or answer questions. Furthermore, Mr. Earl complained of cold, of pain in his leg, and of the desperate need to sleep. These conditions all made him particularly susceptible to the police tactics intended to overcome his will.

### III. CONCLUSION

Mr. Earl maintains these and all arguments previously briefed.

///
///
///
///

*Earl v. Turnbull*
Case No. 3:02-cv-0224-HRH                Page 5

DATED this 26th day of March, 2008.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Mary C. Geddes
Assistant Federal Defender
Alaska Bar No. 8511157
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mary_geddes@fd.org

Certification:

I certify that on March 26, 2008, a copy of the foregoing document, with attachments, was served electronically on:

Kenneth M. Rosenstein, Esq.

/s/ Mary C. Geddes