Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Petitioner

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JACK L. EARL, JR.,<br><br>     Petitioner,<br><br>  vs.<br><br>CRAIG TURNBULL,<br><br>     Respondent. | Case No. 3:02-cv-0224-HRH-DMS<br><br>**MOTION FOR CERTIFICATE OF APPEALABILITY** |

I. <u>Overview</u>

   Petitioner Jack L. Earl's application for habeas corpus has been dismissed by the district court at docket 113.  Pursuant to the requirements of 28 U.S.C.A. § 2253(c)(2) and Fed. R. App. P. 22(b), Mr. Earl now seeks a certificate of appealability to the Ninth Circuit Court of Appeals with respect to some of the court's decisions at Docket 60 and docket 113.

   More specifically, with respect to Docket 60, Mr. Earl seeks to appeal the decision of the court that he had not adequately exhausted <u>part</u> of Claim Four.  With respect to Docket 113, Mr. Earl seeks to appeal the court's decision on the merits with respect to Claim Two and the redacted Claim Four.

II.    Standard of Review

        To receive a COA, Mr. Earl must demonstrate that, with respect to claims decided on their merits, "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). This standard applies to Claim Two and the redacted Claim Four.

        Part of Claim Four was dismissed on procedural grounds. In such an instance, Slack applies to both the procedural ground and the underlying constitutional claim to determine if they are debatable among jurists of reason. Valerio v. Crawford, 306 F.3d 742, 774 (9th Cir. 2002). With respect to the substantive prong, reviewing courts "take only a 'quick look' to determine whether the petition facially alleges the denial of a constitutional right. Lopez v. Schriro, 491 F.3d 1029, 1040-41 (9th Cir. 2007), citing Valerio, 306 F.3d at 775 (internal quotation marks omitted).

III.    Identification of the Claims for a COA[1]

Claim 2.    The state trial court erred in failing to suppress statements.

Claim 4.    REDACTED PORTION: Mistrial should have been granted because of State court's failure to conduct inquiry in face of inherently prejudicial courtroom arrangements.

        UNREDACTED CLAIM: Mistrial should have been granted because of two errors: (1) the prejudicial positioning of courtroom security officers during certain testimonies, and (2) the testimony of Cyril Reape concerning the incarcerated status of the defendant.

Claim Two

        In state court, Mr. Earl sought the suppression of his statements, and the fruits of his statements, on the ground that the police interrogations were not preceded by the advisements required by the Supreme Court's holding in Miranda v. Arizona, 384 U.S. 436, 444 (1966). Mr. Earl

---

[1] Claim One was dismissed on Stone v. Powell grounds and is not the subject of request for a COA.

argued, alternatively, that his statements were inadmissible because they were involuntarily made, i.e., obtained by law enforcement by overbearing or coercive means. See, e.g., Chavez v. Martinez, 538 U.S. 760, 770 (2003) (use of involuntary statements at defendant's trial barred by Fifth Amendment). The state court found that Earl's statements were offered voluntarily and that he was not in Miranda custody.

This district court ruled that the state courts' determinations were not contrary to or an unreasonable applicable of established federal law nor unreasonable factual determinations.

Mr. Earl respectfully contends that fair-minded jurists could differ as to those conclusions. For the threshold purposes of a COA, Mr. Earl sufficiently established through his merit brief that:

- the state court applied a rule that contradicts the governing law set forth in Supreme Court's cases because the decision on "custody" turned, at least partially, upon an impermissible consideration: the defendant's motivations and whether the defendant seemed to believe himself in custody. See Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317 (1984) (court must assess "how a reasonable man in the suspect's position would have understood his situation");

- the state court decisions "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court" because its findings of historical fact were almost non-existent ("There are a lot of things we can look at and say, well, those factors are consistent with the defendant's argument" and "the defendant was not placed in custody formally . . . [and] was constantly assured that he was not under arrest"), and its conclusions wholly summary ("there was no de facto custody here, that there wasn't a functional equivalent of custody, that there wasn't a psychological equivalent of custody");

- the state court decisions "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court" because the appellate court's review, albeit more extensively stated, was defective because it omitted

many facts inconsistent with a failure to suppress the statements and physical evidence the police secured from Earl.[2]

---

[2]  The totality of the circumstances which operated in favor of suppression were not considered:

- At 11:10 p.m. on December 31, police received a 911 call from Jack Earl. (Exhibit 2) Earl reported that, upon returning home, he had discovered the dead body of his roommate, Jeff Ricker. (Id.)
- Anchorage Police Officer Matthew Dahl was the first on the scene (Tr. 78), and made contact with Earl who was inside the front door of the apartment. (Tr. 79)
- Dahl directed Earl to remain where he was. (Tr. 79, 97)
- Dahl remained with Earl as other police officers arrived. Earl was directed to wait outside the apartment building, and Dahl waited with him. (Tr. 79, 99-02)
- Earl was dressed in a t-shirt. He was cold. (Tr. 80, 101)
- Dahl noticed that Earl had blood on his pants (Tr. 102) and seemed intoxicated. (Tr. 103-04)
- Dahl considered Earl a "possible suspect." (Id.)
- Earl was placed in the back seat of the patrol car while Dahl sat in the front seat. (Tr. 82)
- Dahl directed Earl to his patrol car because it was "cold out." (Tr. 80, 82, 105)
- Dahl told Earl he was taping their conversation. (R. 26) Dahl asked Earl to tell him what happened. (Id.)
- Dahl told Earl two things: he was not under arrest, but that the investigators needed to speak with him. (R. 28)
- Earl told Dahl that he urgently needed to urinate. (Tr. 107-08)
- Dahl told Earl that he could not let him return to his apartment but he could urinate at a police substation, to which Dahl would take him. (R. 34)
- Earl asked if he was under arrest. (R. 34)
- Dahl told Earl he was not under arrest, but the police needed to talk to him, and others. (R. 34)
- Dahl transported Earl to the police substation in the patrol car. (R. 30)
- During this drive, Dahl questioned Earl about what had occurred. (R. 26-30)
- The patrol car doors were locked so that only Dahl could open them. (Tr. 116-17)
- Dahl and Earl arrived at the police substation about 11:31 p.m. (R. 30)
- The substation was a small, one room police station with a bathroom. (Tr. 125-27, 170, 172)
- A second police officer arrived at 11:35 p.m., and remained there. (Tr. 130, 168-70;. R. 32)
- After using the bathroom, Dahl did not return or offer to return Earl to his apartment. (Tr. 130)
- Dahl testified that he intended to keep Earl there until homicide investigators arrived. Tr. 130)
- Earl was directed to have a seat at the substation while other officers arrived. (Tr. 128)
- Earl asked to smoke a cigarette, and Dahl and the second officer went with him outside the building. (Tr. 133-34; R. 32-34)
- Earl was told that Officer Dahl could not return inside the substation until Earl finished smoking. (R. 37)
- Earl complained to Dahl that he had been prohibited from getting his coat from his apartment

4

———————————

and said that he wore a brace on his knee when he went out.  (R. 37)

- A third police officer arrived, Sgt. Cobb.  (Tr. 146)
- While he was permitted to smoke outside, on each of three occasions, officers escorted him outside while he did so.  None of the officers smoked.  (Tr. 133-34, 140-41, 148; R. 41-43, 69)
- When Earl next went to the bathroom for a drink of water, a police officer accompanied him. (Tr. 136; R. 45)
- The officers questioned Earl continuously concerning his activities that night, his consumption of drugs and alcohol, the clothing he had worn that night, the source of the blood visible on Earl's clothing, the bruise on Earl's forehead, and other matters related to Ricker's death.  (Tr. 32-38)
- After he had been at the police substation for forty minutes, at 12:09 a.m., Earl asked, "When am I going to get going?" and, later, "When am I gonna go?," to which Dahl twice responded, "I don't know."  (Tr. 133-34, 148.; R. 38)
- While advising Earl again that he was not under arrest, the police repeatedly expressed the need for Earl to speak with the homicide investigators who would want to ask about the results of their search of Earl's residence.  (R. 39)  Earl responded that, "I'll be here, where am I going to go?"  He also said, "I have nowhere to go."  (Id.)
- Earl then asked about retrieving his jacket.  In response to this comment, the police stated, "The investigators should be here in a few minutes, they're just gonna want to talk to you to get important information."  (R. 40)
- Advising Earl again that he was not under arrest, the police asked him to go to the main police station to talk to homicide investigators.  (R. 58)
- Earl refused to go to the main police station, stating, ""Eh uh I'm sorry."  (Id.)
- Despite Earl's refusal to go to the station, the police persisted with 'the need' for him to speak with homicide investigators.  (R. 58)
- When Earl then stated that he would like to go home, Earl was informed he could not go home because his home was a crime scene.  (R. 59)
- Earl again stated he had no other place to go.  (Id.)
- The police once again told Earl that he 'needed' to be interrogated by homicide investigators. (R. 59-60)
- Again, Earl replied that he did not want to go to the police station.  (R. 59-60)
- Earl was also asked for his consent to search his apartment and signed it.  (R. 61-63)
- Officer Dahl told Earl that homicide investigators "can probably help you get a place to stay or something after they talk to you."  (R. 64)
- Dahl told Earl that an investigator was coming and he would need to know what answers Earl could give.  (R. 65)
- When Earl complained again that, "I don't even have a coat," the officers said they knew that, and it was a "bad scene."  (R. 65)
- The police again told Earl that he needed to submit to interrogation by the detectives who had investigated the scene.  (R. 67)
- At 12:31 p.m., after Earl had been at the police substation for an hour, the police officers

offered Earl another cigarette.  For the third time, as mentioned, Earl was escorted outside by officers who did not smoke.  (R. 69, 41-43)

- Earl renewed his request for his coat, and was promised that the police would retrieve it. (R. 42)
- At this time, a fourth officer, homicide investigator Gifford, arrived.  (Tr. 193)
- Earl was told that Jamie, a third and female roommate, was very upset.  Earl was told that Jamie needed Earl's support.  On that basis and for that reason only, Earl was asked if he would go to the main police station.  Earl agreed.  (R. 69-70)
- Sgt. Michael Grimes, the fifth officer arriving at the police substation (Tr. 194), took Earl to the main station.  (Tr. 200-01)
- When they arrived, Grimes escorted Earl into a non-public and secure part of the station. (Tr. 200-03)
- Earl was immediately brought into an interview room with a one-way mirror.  (Id.)
- The police offered no explanation for their failure to permit Earl to speak to Jamie.  (Tr. 201-03, Ex. 8, p. 10)
- The police homicide investigators immediately commenced an interrogation of Earl, despite his prior refusals to be transported to the station for that purpose.  Grimes, Potter, Gifford, and others participated.  (Ex. 8)
- The interrogation at the main station lasted 5 hours.  (Ex. 8)
- Earl accepted an offer of coffee, but asked again for his coat.  He was told it would be awhile until it could be retrieved from his apartment.  (R.74)
- Grimes told Earl that he was not under arrest "right now" (Tr. 206), but that "we need to find out everything that you know."  (Ex. 8, p. 2, 3)
- During the interrogation, Earl intermittently stated he was in pain, hungry, intoxicated (Ex. 8, p. 3, 17-18) and his need of a coat.  (Ex. 8, p. 2,3)
- Earl told the police he suspected he was being taped (Ex. 8) and did not believe he would go home.
- Grimes told Earl that he was not under arrest right now.  (Tr. 206)
- Grimes said he did not believe Earl's account that blood on his pants came from a cut on Earl's hand.
- Grimes told Earl that the police would "have to take" his pants (that he was wearing) for testing.
- Grimes told Earl that he would have a tough time explaining how Ricker's blood got on his pants.  (R. 98)
- Grimes stated that he "knew" the blood on Earl's pants and boots was Ricker's.  (R. 98-99)
- Grimes told Earl that Earl's boot print was on and next to Ricker's body.  (Ex. 8, 25-27)
- Earl repeatedly expressed disbelief that he was free to leave.  (Ex. 8, p. 2, 3, 49 )
- In the course of imploring Earl to tell him what happened, Grimes stated, "We finish our investigation and we just wait and see what happens."  (Ex. 8, p. 25-27)
- Earl then admitted he killed Ricker.  (Ex. 8, p. 27)
- The police continued the interrogation about the killing, over the next four hours.  (Ex. 8, p. 36)

6

Claim Four REDACTED

            This court has also rejected, on the merits, Mr. Earl's remaining claim that the state

court's denial of his motion for a mistrial violated his right to a fair trial.  The redacted Claim Four

---

- At one point during the interrogation, Grimes told Earl to "sit back down."  (Ex. 8, p. 36)
- The police reiterated their intent to seize Earl's clothing.  (Ex. 8, p. 47-48)
- They insisted Earl was not under arrest, and that they would provide him a ride to wherever he wanted to go (Ex. 8, p. 49), once they finished the investigation.  (Ex. 8, p. 65)
- The officers were equally clear, however, that what they needed to do "first" was to take him to provide blood and urine specimens (Ex. 8, p. 55-56) and finish the investigation.  (Ex. 8, p. 65, 69)
- At a point later in the interrogation, Earl confronted Grimes with his earlier statement that Earl was not being taped.  Grimes admitted he was.  (Ex. 8, P. 72)
- Grimes told Earl that part of their "policy" was to take fingerprints, palm prints, and photographs of him, so that they can do their investigation.  (Ex. 8, p.88-89)
- In light of this, Earl continued to express his disbelief that he was being released.  (Id.)
- When Investigator Gifford joined Grimes and Potter, Earl was asked to repeat his account. After initially refusing, he was again interrogated.  (Ex. 8, p. 100)
- Earl repeatedly reiterated his disbelief he would be allowed to leave.  Gifford responded, "Well, we gotta look at everything . . . y'know . . . take out time and make sure we get everything right.  (Ex. 8, p. 104).
- When Earl was asked to provide consent for blood and urine specimens, Earl refused.  He said, "No chance," "No!," "Cannot," "Will not," and "Huh uh."  (Ex. 8, p. 55-56)
- Despite these refusals, the police persisted with their "need to do this" and Earl ultimately relented.  (Ex. 8, p. 56)
- Near the end of the interrogation, Gifford reassured Earl, that "when we get done, you're gonna leave."  (Ex. 8, p. 129-30)
- When Earl again questioned that he would be permitted to leave, Gifford told him he would be permitted "when we're done."  (Ex. 8, 129-30)
- Earl was then taken by two investigators, Grimes and Potter, to the hospital.  (Ex. 8, 137, 143-44, Tr. 181, 587)
- Specimens were taken from Earl at 5:10 p.m.  (Tr. 208)
- Sometime after 6:00 a.m. Earl was released at a restaurant, with a few dollars for breakfast. (Tr. 181-83)
- He was arrested that afternoon.  (Tr. 208)

stated that Mr. Earl's right to a fair trial was prejudiced by state conduct in the form of the selective positioning of uniformed officers during his, and other incarcerated defense witnesses', testimonies.

This district court determined that the procedure employed was not inherently prejudicial, that the state court action was not an unreasonable application of Supreme Court precedent, and that the state court did not make an unreasonable factual determination in its review of this procedure. Mr. Earl seeks a COA on each of these aspects of the court's ruling because fair-minded jurists could differ in their determinations.

By way of background, the courtroom security arrangements necessitated five changes of officers' positions within the defense case. These back-and-forth changes of position were likely to draw the jury's attention. And because the officer was stationed inside, and not outside, the jury door of the courtroom, jurors could infer that the guard was positioned there to specifically protect them, and not merely to guard the exit. Significantly, Mr. Earl had already been sitting in the courtroom throughout the trial. Since he had not been disruptive during the trial, the movement of courtroom security to the jury's vicinity for his testimony made a glaring statement, i.e., Mr. Earl was in fact dangerous and not to be trusted close to the jury. Despite the timely objection of counsel, the court did not consider the necessity for such an arrangement, but merely indicated his deference to the arrangements made by the officers.

The Constitution, as a matter of due process under the Fifth and Fourteenth Amendments, protects the right to a fair trial. Estelle v. Williams, 425 U.S. 501, 503-04 (1976). The Supreme Court has ruled that when a particular display such as prison garb reminds the jury of his incarcerated status, there is "an unacceptable risk of impermissible factors coming into play." Williams, 425 U.S. at 505. Why is this wrong? Because, "In the constitutional sense, 'evidence

8

developed' against a defendant shall come from the witness stand" only, and not from other sources. *Turner v. Louisiana*, 379 U.S. 466, 463, 85 S. Ct. 546 (1965).  In this case, the evidence was not merely the defense witnesses' incarcerated status – it was evidence suggesting dangerousness and untrustworthiness.  Therefore, the procedure was inherently prejudicial.  Compare Holbrook v. Flynn, 475 U.S. 560, 568, 106 S. Ct. 1340 (1986).

Before a trial court allows inherently prejudicial arrangements, the court must first determine that the action is justified.  Reminders that a witness and/or accused is confined "may affect a juror's judgment," id., and these were flagrant.  It is not known in this case whether the questioned arrangement could have been justified.  This was not a case in which a the decorum of the court had been threatened by a witness – there were no outbursts – nor was there a "contumacious" defendant who had to be controlled.  Compare Illinois v. Allen, supra, 397 U.S. at 334.  See also Holbrook v. Flynn, supra, 475 U.S. at 568-69; see also Illinois v. Allen, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).  Thus, the trial court's decision to defer to the arrangements of courtroom security officers was unreasonable.  The appellate court's assumption that the facts justified the arrangement was a finding without a reasonable factual basis.

Claim Four (REDACTED)

Mr. Earl also respectfully seeks a COA on the court's decision, early-on in this case, to dismiss part of Claim Four.  That decision was premised on the determination that part of Claim Four had not been exhausted.  The impact of the court's decision was that while Mr. Earl could litigate the denial of his motion for mistrial he could not thereafter invoke one of the two facts which were identified in the merit appeal as creating the prejudice which would support a mistrial.

Mr. Earl continues to aver that the premises for mistrial were fully explicated in his merit appeal briefing [at Opening Brief 22-33] to the state Court of Appeals, and necessarily abbreviated in his petition for hearing before the Alaska Supreme Court, as required by state court practice. The petition invoked the unpublished memorandum decision (which is attached to every petition), and asked that the Supreme Court reverse the determination of the Appeals Court with respect to the mistrial issue.

The principal basis for the mistrial motion was the prejudice created by the different courtroom positions taken by judicial service officers when custodial witnesses (Cyrus Reape, David Lewis, and Jack Earl) testified. Such positioning effectively informed the jury that the witnesses were incarcerated or dangerous or both. However, the additional information elicited from the examination of Cyrus Reape – that he and Earl lived in the "same facility," which could have referenced only a correctional or a mental institution – would have cemented any impression that Leape, Lewis, and Earl were dangerous. [Opening Brief, pp. 32-33]

A close consideration of the Court of Appeals's discussion of Mr. Earl's mistrial issue reveals that the two premises were evaluated jointly. Reviewing a claim of prejudice based on the treatment of defendants or witnesses requires "a practical assessment," as the Court wrote, one that is contextual. The issue on appeal was whether the proceeding identified the defendant and defense witnesses "as someone in custody to the jury, thus undermining the presumption of innocence and prejudicially affecting the defendant's right to jury trial," quoting Hines v. State, 703 P.2d 1175, 1176 (Alaska App. 1985) (discussing ABA Standards Relating to Trial by Jury § 4.1 (Approved Draft 1968)).

There is no question that the Alaska Supreme Court received adequate notice of the legal issue (should mistrial have been granted) and the relevant facts through the combination of a summary petition and the Court of Appeals decision which detailed the specific facts pleaded as the demonstration of prejudice. Alaska Appellate Procedure Rule 303(b)(3) in fact specifically mandates that "facts correctly stated in the opinion of the intermediate appellate court should not be restated."

Therefore, Mr. Earl respectfully requests a COA on this procedural basis for dismissal.

DATED this 4th day of August, 2008.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Mary C. Geddes
Assistant Federal Defender
Alaska Bar No. 8511157
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mary_geddes@fd.org

Certification:

I certify that on August 4, 2008, a copy of the foregoing document, with attachments, was served electronically on:

Kenneth M. Rosenstein, Esq.

/s/ Mary C. Geddes